**DANJAQ, S.A., a corporation, Plaintiff,**

**v.**

**MGM/UA COMMUNICATIONS, CO., a corporation; Pathe Communications Co., a corporation, et al., Defendants.**

**No. CV 90–5498–SVW.**

United States District Court,
C.D. California.

June 26, 1991.

Howard, King, Kevin S. Marks, Gang, Tyre, Ramer & Brown, Inc., Los Angeles, Cal., for plaintiff.

Terry D. Avchen, Eric N. Landau, John M. Gatti, Christensen, White, Miller, Fink & Jacobs, Los Angeles, Cal., for defendants MGM/UA Comm. Co., Tracinda Corp. and K. Kerkorian.

Arthur Groman, Thomas Lambert, Daniel Romano, Ann Loeb, Mitchell, Silberberg & Knupp, Los Angeles, Cal., for defendants Pathe Comm. Corp. and MGM–Pathe Comm. Co.

## ORDER DISMISSING COPYRIGHT ALLEGATIONS FOR FAILURE TO STATE A CLAIM AND DISMISSING REMAINING STATE–LAW CLAIMS FOR LACK OF SUBJECT MATTER JURISDICTION

WILSON, District Judge.

### Introduction

In the beginning, harmony prevailed among Bond's assistants. Danjaq, S.A. ("Danjaq") produced Bond films and MGM/UA Communications Co. ("MGM") distributed them. Sixteen Bond films in all, from "Dr. No" to "License to Kill," were produced and distributed under this arrangement, going back 19 years to the 1962 Distribution Agreement between Danjaq and MGM (the "Distribution Agreement"). But perfect harmony cannot last forever, and Pathe Communications Co. ("Pathe") appeared on the scene to prove this saying true.

Pathe made a bid for and in November 1990 acquired MGM to form a new entertainment industry giant MGM–Pathe. In the eleventh hour before the merger, Danjaq, suspecting the derogation of its rights under the Distribution Agreement, appealed to this court, without success, to enter a restraining order against the merger. Danjaq's complaint depicted a Machiavellian scheme by Pathe to finance the merger by peddling Bond films throughout the world at "fire-sale" prices. The alleged wrongs were breach of contract, breach of fiduciary duty, conspiracy to do the same, and copyright infringement.

In the end, it turns out that the copyright allegations do not state a claim and there is no diversity of citizenship between the parties so as to confer jurisdiction upon this court to hear the state-law claims.

### Background

Danjaq is incorporated in Switzerland with its principal office in Lausanne. Danjaq's sole director is a Swiss attorney, Mr. Schlaeppi, residing in Lausanne. Mr. Schlaeppi admittedly knows little about the entertainment industry and performs strictly ministerial functions on behalf of Danjaq, and on behalf of fifteen other corporations for whom he serves in a similar capacity of a sole director. Danjaq has one additional employee in Switzerland, Mr. Reynard, who performs the bookkeeping function of monitoring royalty and other payments made to Danjaq's accounts in Switzerland. Danjaq files its income tax returns in Switzerland.

Danjaq's principals, Albert Broccoli and his wife Dana, have been residents of Los Angeles for the past twenty years. Danjaq's general counsel in the United States is Mr. Tyre of Gang, Tyre, Ramer & Brown, a Los Angeles law firm. Danjaq's principal business relationship is with MGM, which finances and distributes Bond films under the Distribution Agreement with Danjaq. Los Angeles is the situs of several meetings each year between the policymaking personnel of Danjaq and MGM. Mr. Broccoli maintains an office in the MGM building in Culver City, California, although the office is formally the headquarters of Warfield Productions, Inc., a separate entity controlled by Mr. Broccoli.

The actual business of filmmaking historically has been carried on by Danjaq through its wholly-owned U.K. subsidiary, Eon Productions, Ltd. ("Eon"), based in Pinewood studios outside of London. The scripts for Bond films are reviewed and plots conceived by Mr. Broccoli in Los Angeles in consultation with his London-based co-producer and stepson, Michael Wilson. Eon is charged with putting ideas on the screen. The production company goes on

location anywhere in the world where the dauntless Mr. Bond is needed, and returns to Pinewood studios for final editing. When a film is completed, Eon formally sells the picture to its parent corporation, Danjaq.

Discussion

## I. DIVERSITY OF CITIZENSHIP

The plaintiff is a citizen of the world, Swiss in origin, but with a presence in Lausanne, Los Angeles, London and New York. Defendants are all citizens of California. To maintain suit in this court, the plaintiff's principal place of business must be other than California. *See* 28 U.S.C. § 1332(c).

### A. *Whether an Alien Corporation is a Citizen of its Principal Place of Business for Purposes of Diversity Jurisdiction ?*

■ Prior to 1958, an alien corporation was considered, for purposes of diversity jurisdiction, a citizen solely of the foreign country of its incorporation. *See* Wright, Miller & Cooper, *Federal Practice and Procedure,* 2d, § 3628, at 662 (1984). In that year, Congress opted to reduce the caseload of the federal courts by adding Section 1332(c) to the Judicial Code. *Id.* Section 1332(c) is now a familiar principle of law providing that for purposes of diversity jurisdiction a domestic corporation is deemed a citizen of its state of incorporation and of the state of its principal place of business. 28 U.S.C. § 1332(c). Whether alien corporations, like their domestic counterparts, are subject to the same dual-citizenship rule has been debated in the more than thirty years since the enactment of Section 1332(c). At the outset, it must be noted that the Ninth Circuit has thus far taken no part in that debate.

The first case to consider the issue employed a close literal analysis of § 1332(c), concluding that the statute did not apply to alien corporations because the word "State" used in § 1332(c) is spelled with a capital "S," which Congress uses to designate a state of the United States. *See Eisenberg v. Commercial Union Insurance Company,* 189 F.Supp. 500, 502

(S.D.N.Y.1960). In the alternative, the *Eisenberg* court held that, even if § 1332(c) applied to alien corporations, the worldwide principal place of business of the defendant alien corporation lay outside of the United States. *See id.* In the years following that decision, the trend has been to adopt the alternative holding of *Eisenberg,* applying § 1332(c) to alien corporations, as arguably more consistent with the intent of Congress to limit diversity jurisdiction. *See Continental Motion Pictures v. Allstate Film Co.,* 590 F.Supp. 67, 70–72 (C.D.Cal.1984) (alternative *Eisenberg* holding is the "emerging rule"); *see also Clifford Corp., N.V. v. Ingber,* 713 F.Supp. 575 (S.D.N.Y.1989).

The Fifth Circuit, which was the first court of appeals to address the issue, adopted the alternative holding in *Eisenberg,* citing congressional intent to limit diversity jurisdiction to out-of-state citizens who are potentially subject to local bias. *See Jerguson v. Blue Dot Investment, Inc.,* 659 F.2d 31 (5th Cir.1981), *cert. denied* 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469. Recently, the Eleventh Circuit reached the same result. *See Cabalceta v. Standard Fruit Company,* 883 F.2d 1553 (11th Cir.1989).

Indeed, the same kind of abuse of diversity jurisdiction practiced by domestic corporations prior to § 1332(c) could be practiced by alien corporations nominally incorporated abroad but maintaining a substantial, if not a dominant, presence in some state of the United States. In the present context, there would no reason to afford the protections of a federal forum to a Swiss corporation if all of its visible public activities were carried on in California. *See Industrial Tectonics, Inc. v. Aero Alloy,* 912 F.2d 1090, 1094 (9th Cir.1990) ("local contact alleviates problems with local prejudice against outsiders"). This is the evil that Congress intended to eradicate by the enactment of § 1332(c).

Accordingly, § 1332(c) is applicable to alien corporations, such as plaintiff Danjaq, and it remains for the court to locate Danjaq's worldwide principal place of business.

**B.** *Whether Activities of a Subsidiary are Attributed to the Parent Corporation for Purposes of Determining the Parent Corporation's Principal Place of Business?*

■ The question of whether to attribute Eon's activities to Danjaq is of critical importance here, because the most visible and substantial activities of a filmmaker are associated with the films' production. Production requires a large staff, space, and business contacts, all of which tend to forge stable ties between the filmmaker and the community. Historically, Danjaq's production activities have been carried on by its U.K. subsidiary, Eon. Danjaq now contends that its principal place of business, if not Switzerland, must be Great Britain in view of Eon's substantial and longstanding presence there.

It has long been a matter of settled law that a subsidiary corporation maintains its own principal place of business, for purposes of diversity jurisdiction, apart from its parent corporation. *See* Wright, Miller & Cooper, *Federal Practice & Procedure, supra,* § 3625. What appears to be less clear is the separate principal place of business of the parent corporation apart from the activities of its subsidiaries.

The only appellate decision directly to address this issue concluded that the separate corporate identities of the parent and subsidiary could not be ignored for the purpose of locating the parent's principal place of business. *See de Walker v. Pueblo International, Inc.,* 569 F.2d 1169 (1st Cir.1978). In *de Walker,* the defendant corporation operated a chain of supermarkets in Puerto Rico but also owned a New Jersey subsidiary which accounted for 60% of the revenues of the parent corporation on a consolidated basis. *Id.* at 1171. In addition, the corporation's internal documents referred to the New Jersey subsidiary as a "division." *Id.* In spite of this uncontestably close relationship between the subsidiary and the parent, the First Circuit, relying on a line of Supreme Court cases relating to personal jurisdiction, concluded that the integrity of the corporate form must be respected in the absence of a formal piercing of the corporate veil. *See id., citing Cannon Manufacturing Co. v. Cudahy Packing Co.,* 267 U.S. 333, 335, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925) (per Brandeis, J.).

To controvert First Circuit's analysis in *de Walker,* Danjaq cites two district court cases decided soon after the enactment of § 1332(c). *See Textron Electronics, Inc. v. Unholtz–Dickie Corp.,* 193 F.Supp. 456 (D.Conn.1961); *Lancer Industries, Inc. v. American Insurance Company,* 197 F.Supp. 894 (W.D.La.1961). Both decisions consolidated activities of subsidiary corporations with those of the parent for the purpose of locating the parent's principal place of business. In *Textron,* the court observed that the phrase "principal place of business" is not new but already appears in the (now-repealed) Bankruptcy Act and that the legislative history of § 1332(c) encouraged the courts to be guided by bankruptcy decisions when construing the identical phrase in § 1332(c). *See* 193 F.Supp. at 458; *see also* S.Rep.No. 1830, 85th Cong., 2d Sess. 5 (1958), *reprinted in* U.S.Code Cong. & Admin.News 1958, at 3102. The *Textron* court then concluded that "[i]nclusion of a subsidiary's business as a part of the business of the parent corporation ... is no innovation as far as the Bankruptcy Act is concerned." 193 F.Supp. at 459. Each step in the *Textron* analysis is now worth re-examining.

The old Bankruptcy Act authorized venue for a corporate debtor in the district in which such debtor had its "principal place of business." *See* 11 U.S.C. § 11, sub. a(1), *repealed by* Pub.L. 95–598. As a consequence, a whole body of law grew around the construction of the venue provision, with place of operations and location of executive offices emerging as the two principal tests for determining a corporation's bankruptcy venue. *See* 1 Moore, Moulder, *Collier on Bankruptcy,* 14th ed., § 2.19, at 214. However, nothing in the congressional record, in the Bankruptcy Act, or cases decided thereunder gives guidance on how to treat the activities of a wholly-owned subsidiary. On this issue, the bankruptcy jurisprudence is even more obscure than the jurisprudence under § 1332(c). Al-

though the *Textron* court concluded that the consolidation of a subsidiary's activities with those of its parent is "no innovation" under the Bankruptcy Act, it relied for this proposition on a murky lower court ruling made some forty-five years prior to the *Textron* decision.

In fact, it is an undisputed axiom even in bankruptcy that "ownership of all of the outstanding stock of a corporation is not the equivalent of ownership of the subsidiary's property or assets." 5 King, *Collier on Bankruptcy*, 15th ed., § 1100.06; *see, e.g., In re Beck Industries, Inc.*, 479 F.2d 410 (2d Cir.1973), *cert. denied* 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108. Except where it operates as a mere shell or a fraud, a corporation retains a separate legal identity apart from its shareholders, whether they number one or many. This is the rule as much in bankruptcy as in other areas of the law. *See, e.g., Stone v. Eacho*, 127 F.2d 284 (4th Cir.1942). In light of this well-settled principle, the *Textron* decision appears to be unfounded insofar as it relies on bankruptcy jurisprudence to attribute activities of a separately incorporated subsidiary to the parent. (The *Lancer* case, decided in the same year as *Textron* and relying primarily on it, does not need to be separately addressed.)

Accordingly, since no alter-ego showing has been made here by Danjaq, there is no reason to disregard the separate corporate identity of Eon.[1] *See de Walker v. Pueblo International, Inc., supra.*

Indeed, the divergence in result between *de Walker* and *Textron* is not so surprising, because the *Textron* court rejected without discussion the relevance of a line of Supreme Court cases which was found to be controlling in *de Walker. See Textron Electronics, Inc. v. Unholtz–Dickie Corp., supra*, 193 F.Supp. at 459; *de Walk-*

er v. Pueblo International, Inc., supra, 569 F.2d at 1172–73. In *Cudahy Packing*, the Supreme Court held that the courts cannot look to the activities of a subsidiary for the purpose of determining whether its parent corporation was "doing business" in a state. *See Cannon Manufacturing Co. v. Cudahy Packing Co., supra*, 267 U.S. at 335–37, 45 S.Ct. at 250–52. From this the First Circuit concluded that if a parent corporation cannot "do business" in a state by reason of the activities of its subsidiary, a fortiori, it cannot have its "principal place of business" in that state. *de Walker v. Pueblo International, supra*, 569 F.2d at 1173.

It is a firmly established principle of our jurisprudence, reiterated in *Cudahy Packing*, that a corporation exists separately even from its sole shareholder, despite such shareholder's ability to direct the activities of the corporation. While the corporate separation between Danjaq and Eon may perhaps be merely formal, it is nonetheless real. *See Cannon Manuf. v. Cudahy Packing Co., supra*, 267 U.S. at 337, 45 S.Ct. at 251 ("The corporation separation, though perhaps merely formal ... was not pure fiction."). If any doubts existed about the continued vitality of this principle, they have been put to rest by a recent decision of the Supreme Court. *See Carden v. Arcoma Associates*, 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). In *Carden*, the Supreme Court noted that the corporation remains the one artificial entity in our law whose citizenship, for jurisdictional purposes, is determined without reference to the identity or character of its owners. *Id.* 110 S.Ct. at 1017–19.

There is a separate argument favoring the respect for Danjaq's separate identity apart from Eon. It appears beyond doubt that if Eon itself had brought this lawsuit against MGM, Eon would be entitled to a

---

1. The commentaries shed little light on this point. Professor Miller adopts, without discussion or citation to other cases, the questionable holding of *Textron. See* Wright, Miller & Cooper, *Federal Practice & Procedure, supra*, at § 3625 (Some of the cases cited in the treatise along with *Textron* involve the inapposite situations of determining the subsidiary's, not the parent's, principal place of business. *See, e.g.,*

*Burnside v. Sanders Associates, Inc.*, 507 F.Supp. 165, 166 (N.D.Tex.1980), *cited* at § 3625 n. 41.) Professor Moore, in a cryptic footnote, citing *Textron*, suggests that "the activities of the subsidiaries may also be considered in determining the principal place of business of the parent corporation." *Moore's Federal Procedure*, at § 3.2 n. 7.

federal forum as a U.K. corporation with its principal place of business in the U.K. The problem with that suit would be that Eon is not a signatory to the Distribution Agreement with MGM, and to bring such a suit Eon would have to vault over additional hurdles, such as establishing a third-party beneficiary claim against MGM. Instead, what Danjaq chose to do is to bring the suit in its own name, thereby eliminating the additional hazard of a third-party beneficiary claim, but also to request a federal forum in the name of Eon. This kind of oblique maneuver cannot be rewarded.

If Eon is not a party to the present action and its rights are not hereby adjudicated, then Eon would not be prejudiced by the unavailability of a federal forum. The fact that Eon is based in London and is an "outsider" in California is of no moment here. A federal forum cannot be invoked in Eon's name if no right of Eon is on the line in this suit.

Accordingly, plaintiff Danjaq's principal place of business will be determined without regard to the activities of its subsidiary Eon. *See de Walker v. Pueblo International, Inc., supra,* 569 F.2d at 1171.

### C. *The "Nerve Center" Test.*

■ The courts have developed several not necessarily inconsistent tests for locating a corporation's principal place of business. Where a majority of a corporation's visible public activities is conducted in a single state, that state is designated as the corporation's principal place of business. *See Industrial Tectonics, Inc. v. Aero Alloy, supra,* 912 F.2d at 1094. Plainly, a corporation cannot be an "outsider" in the state where it carries on a majority of its operations, employs the most people, and interacts most visibly with the public. However, where the activities of a corporation are dispersed among many states or countries, such that no state accounts for a majority of its business, the courts have applied the "nerve center" test to locate the principal place of business of a far-flung enterprise. *See Scot Typewriter Corp. v. Underwood Corp.,* 170 F.Supp.

862 (S.D.N.Y.1959). Typically, the corporation's nerve center is coincident with the situs of its executive headquarters and of its administrative apparatus. *See id.*

The financier of Danjaq's films and the United States distributor is MGM, located in Los Angeles, but the worldwide distributor of Bond films is UIP, a U.K. company located in London. The owner (together with his wife) and the chief moving force of Danjaq, Mr. Broccoli, resides in Los Angeles, while Michael Wilson, his stepson and co-producer, spends most of his time in London as an officer of Eon. Danjaq's administrative records are in Lausanne; the full-time salesman, Mr. Beck, is in New York; the general counsel, Mr. Tyre, is in Los Angeles; U.S. tax counsel, the law firm of Arnold & Porter, are in Washington; the stage props are in London.

Among the tangible property owned by Danjaq, the chief is the "Albert R. Broccoli/007 stage," the largest film stage in the world, located at Pinewood studios outside of London; some camera equipment is also stored there. The various props from the Bond films, "Jaws'" titanium teeth, the "golden gun," the Aston–Martin cars, when they are not in London, are exhibited worldwide to cheering Bond fans.

What emerges from this account of Danjaq's operations is that no single place claims a majority of its corporate activities, and the application of the nerve center test is therefore appropriate.

The novelty, also the difficulty, of applying the nerve center test to the present case lies in Danjaq's separation of its administrative and executive apparatus. Usually, the two go hand in hand, but not here. *See, e.g., Scot Typewriter Corp. v. Underwood, supra,* 170 F.Supp. 862. There is no dispute that Danjaq's representatives in Switzerland, Messrs. Schlaeppi and Reynard, make no decisions on behalf of Danjaq, and in general know little about the film industry. Although Mr. Schlaeppi reviews all of Danjaq's contracts for compliance with Swiss law (to the extent that Swiss law bears on Danjaq's contracts), he does not initiate or conduct any negotiations on behalf of Danjaq. Mr.

Reynard's role in the operation, as earlier described, is even more modest. He keeps track of payments made to Danjaq's accounts and deposits them in interest-bearing bank accounts only, with no authority to make more imaginative investments.

If put in anatomical terms, Switzerland is Danjaq's stomach reflexively churning the enterprise's profits, but it is hardly a nerve center. The brains of the operation, committing the company to its next assignment or a critical contract, are in Los Angeles. Los Angeles is where Mr. Broccoli reviews the scripts for the next Bond challenge and envisions future plot lines. It is from Los Angeles that the nerve impulse emanates to Lausanne, London, New York and elsewhere, sending the people in motion on the next project. Los Angeles is Danjaq's nerve center, London is the muscle and Lausanne, the stomach. Accordingly, Los Angeles is Danjaq's principal place of business.

Mr. Broccoli has lived in Los Angeles during the last twenty years. He has testified at a hearing that he and his company are well known to the filmmaking community here. Danjaq's crucial discussions with MGM are carried on in Los Angeles several times during the year, and important decisions are made here. In short, Danjaq, whose chief decisionmaker lives and works within a few miles from Hollywood and this courthouse, is hardly an outsider to this forum. Danjaq has not convinced this court that it requires protection from local prejudice that diversity jurisdiction affords to true outsiders.

## II. COPYRIGHT CLAIMS

### A. Copyright Allegations

Danjaq and MGM are co-owners of copyright to Bond films. Mindful of the well-established proposition that "[o]ne joint owner cannot be liable for copyright infringement to another joint owner, for reason that one cannot infringe his own copyright," Danjaq has asserted a copyright infringement claim only against Pathe and not MGM or other defendants. 1 M. Nimmer & D. Nimmer, *Nimmer on Copyright*, § 6.10; *see also Oddo v. Ries*, 743 F.2d 630, 632–633 (9th Cir.1984).

The substance of Danjaq's accusations is that, prior to the merger with MGM, Pathe toured the capitals of Europe offering to license the exhibition of Bond films to every television station along the way at cut-rate prices, thereby diminishing the value of Danjaq's copyright on the world market. Counsel alleges that negotiations were conducted between Pathe and French, Italian, and Spanish telecasters. Only the Spanish deal is alleged to have culminated in a final licensing agreement. In each case, Pathe made its licensing offer contingent upon a successful merger with MGM.[2]

No primary infringement of the Bond copyright, such as a public display or distribution of the films, is alleged in the complaint. Danjaq seeks to impose copyright liability upon Pathe solely for its, as yet unconsummated, "authorization" of public performances of Bond films.

### B. Contributory Infringement Before and After 1976

The Copyright Act reserves to the owner of copyright the exclusive rights "to do and *to authorize* any of the following": the reproduction of the copyrighted work, the preparation of derivative works, the distribution or sale of the copyrighted work, and its display and performance in public. *See* 17 U.S.C. § 106 (emphasis added). Anyone who violates any of the exclusive rights of the copyright owner is an infringer of copyright, liable to the owner for actual or statutory damages, and, in the discretion of the court, for costs and attorney's fees. *See* 17 U.S.C. §§ 501–505. Danjaq contends that Pathe infringed its exclusive right "to authorize" the performance of Bond films. Thus, the viability of Danjaq's copyright claim rests on the court's construction of a key word in the statute.

---

**2.** The conditional character of the licensing offer may be important because with the acquisition of MGM, Pathe would also acquire a part ownership interest in the Bond copyright, thereby immunizing itself from infringement liability for any showings of Bond films made after the merger.

The word "authorize" did not appear in the Copyright Act of 1909 but was added by Congress in 1976. *See Peter Starr Prod. Co. v. Twin Continental Films,* 783 F.2d 1440, 1443 (9th Cir.1986); *see generally Nimmer on Copyright, supra,* § 12.-04(A). The absence of an express statutory mandate, however, did not prevent the courts from imposing, in appropriate circumstances, liability upon contributory infringers of copyright long before the 1976 amendment; examples of contributory infringement before 1976 included the licensing of copyrighted works or authorizing third parties to display publicly copyrighted works without the copyright owner's permission. *See, e.g., Northern Music Corp. v. King Record Dist. Co.,* 105 F.Supp. 393, 400 (S.D.N.Y.1952) (defendant infringed plaintiff's copyright by "authorizing public performances of the infringing musical composition").

The pre–1976 law was stated by the Second Circuit as follows: a party "who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another, may be held liable as a 'contributory infringer.'" *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971). Contributory infringement, under this standard, plainly does not lie without primary infringement. This, of course, does not mean that the primary infringer must be a co-defendant in the case; there may be many reasons why a party may not be held accountable for its conduct in court. What is important is that contributory infringement be hinged upon an act of primary infringement, even if the primary infringer for some reason escapes judicial scrutiny. *Cf. Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 526, 92 S.Ct. 1700, 1706, 32 L.Ed.2d 273 (1972) (patent case) ("But it is established that there can be no contributory infringement without the fact or intention of a direct infringement.").

The novel question presented in this case is whether the law has changed since 1976 that is, whether copyright liability may now be imposed upon an authorization that does not in fact culminate in a primary infringement of copyright.

When Congress added the word "authorize" to the Copyright Act of 1976, it may have intended simply to codify the antecedent jurisprudence of contributory infringement, without creating a new and separate basis for copyright liability. The House Report lends some support to this position: "[u]se of the phrase 'to authorize' is intended to avoid any questions as to the liability of contributory infringers." H.R.Rep. No. 1476, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Admin. News, 5659, 5674.

In addition, Professor Nimmer in the latest edition of his treatise suggests that in "all but exceptional circumstances, the act of authorization *simpliciter* is unlikely to damage the copyright owner." *See* 3 *Nimmer on Copyright, supra,* at § 12.04(A). For this reason, Professor Nimmer suggests that instances of unconsummated authorization do not merit the invocation of federal court jurisdiction under the Copyright Act. *See id.*

Although instances are conceivable in which an act of authorization alone may injure the copyright owner, such instances in all likelihood are remediable under the applicable state law without the need to invoke jurisdiction under the Copyright Act. *See id.* Tort actions in the nature of interference with prospective economic advantage are particularly apt in providing relief to the copyright owner in those exceptional circumstances where he is injured by a naked authorization. *See id.* n. 85; *Cf. Ernst & Ernst v. Carlson,* 247 Cal. App.2d 125, 55 Cal.Rptr. 626 (1966) (defendant enjoined from interfering in plaintiff's relationship with its clients).

Indeed, Professor Nimmer's general proposition is amply borne out by the plaintiff's complaint in this action. Danjaq has not been at a loss to find state-law causes of action against Pathe or MGM. The complaint alleges that Pathe's acts of authorization, made with MGM's permission, amounted to a breach of contract and fiduciary duty by MGM, and a conspiracy by MGM and Pathe to interfere with Danjaq's

contractual rights, and a conspiracy to breach fiduciary duty. This list, which may grow longer with discovery, suggests that Danjaq will not be left without some remedy if in fact the value of its Bond copyright had been wrongfully diminished through Pathe's negotiations in Europe.

Thus, there exists substantial authority in the congressional record and in the commentaries for confining the scope of authorization liability under the Copyright Act of 1976 to the bounds of contributory infringement liability, as that concept had developed under the Copyright Act of 1909. If so confined, authorization liability would lie only where direct infringement had in fact occurred, and state law would be entrusted to render complete justice in those rare instances where an unconsummated act of authorization redounds to the copyright owner's loss.

### C. Authorization of Extraterritorial or Otherwise Noninfringing Use

■ The court may reserve for another day the broad question of whether an unconsummated authorization is ever actionable under the Copyright Act. The present case is susceptible to summary resolution on a much narrower ground: Danjaq's copyright allegations fail to state a claim, because Pathe did not authorize an *infringing* use of Bond films. This is to say that direct infringement did not just fail to materialize in this case but rather was precluded by the very terms of Pathe's alleged authorization.

Section 106 of the Copyright Act does not prohibit every authorization in respect of a copyrighted work but only authorizations of an infringing use of a copyrighted work, such as public display or distribution. In a recent case, for example, copyright owners brought an infringement suit against a hotel for renting videodiscs and providing video equipment to the hotel guests for in-room viewing of copyrighted motion pictures. *See Columbia Pictures Ind., Inc. v. Professional Real Estate Inv.*, 866 F.2d 278 (9th Cir.1989). The plaintiffs contended that hotel rooms were public places and that the hotel, therefore, authorized public performances of copyrighted works. *See id.* at 280. But the Ninth Circuit disagreed, holding that hotel rooms were not public places under the Copyright Act and affirming, without further discussion, a summary judgment for the defendant hotel. *Id.* at 282. To be sure, the Ninth Circuit did not hold that the hotel did not authorize the performances of copyrighted works, which the hotel certainly did, but rather that the performances so authorized did not infringe the exclusive rights of copyright owners because such performances were nonpublic. The decision in *Columbia Pictures* has confirmed the intuitive suspicion that no liability can arise under the Copyright Act from the authorization of a noninfringing use of a copyrighted work.[3]

There are two separate grounds for likening the present case to *Columbia Pictures*, though the court will rely on only one of them. First, Pathe's conditional licensing offer must have been stated in roughly these terms: "I will allow you to show the film next month, for a fee, provided that in the meantime I acquire copyright to the film from the current owner." Plainly, if the terms of such authorization were faithfully carried out, and the film were actually shown, no primary infringement would occur because the authorizer would become the owner of copyright before the day of the showing. Thus, a conditional license may not, depending on its precise terms, authorize an infringing use of a copyrighted work. The determination of the relevant terms, however, must await a full hearing or even a trial.

The second ground, which easily lends itself to resolution on a motion to dismiss, rests on the undisputed axiom that the

---

**3.** The converse of the *Columbia Pictures* case, involving the same plaintiff but different defendants, arose in the Third Circuit, where a video store rented video cassettes and, if a patron so desired, a small room within the video store equipped with a video player to view the rented tape. *See Columbia Pictures Ind., Inc. v. Aveco, Inc.*, 800 F.2d 59 (3d Cir.1986). In *Aveco*, the Third Circuit found the video rooms to be public places and imposed liability on the video store for having authorized public performances of copyrighted works. *Id.* at 61–64.

United States copyright laws do not operate extraterritorially. *See, e.g., American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 356, 29 S.Ct. 511, 512, 53 L.Ed. 826 (1909) (per Holmes, J.); *Filmvideo Releasing Corp. v. Hastings*, 668 F.2d 91 (2d Cir.1981); *see generally* 3 *Nimmer on Copyright, supra*, at § 17.02. Even a public performance of a copyrighted film overseas does not violate the U.S. Copyright Act. It may, perhaps, violate the copyright protection laws of the country of performance, but not those of the United States. *Cf. Robert Stigwood Group v. O'Reilly*, 530 F.2d 1096, 1101 (2d Cir.1976) ("The Canadian performances, while they may have been torts in Canada, were not torts here.").

Taking as given that the performance of Bond films on European television would not infringe Danjaq's U.S. copyright, the court must conclude that Pathe's alleged authorization of such performances is not actionable under the U.S. Copyright Act, not any more than was the defendant hotel's authorization of nonpublic performances in *Columbia Pictures*. The exclusive right of the copyright owner under Section 106 is not to authorize every performance of a motion picture, but only public performances and, because the section is enacted against a general background presumption of non-extraterritoriality, only in the United States. *See E.E.O.C. v. Arabian American Oil Co.*, — U.S. ——, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) (background presumption against extraterritoriality).

It is simply not possible to draw a principled distinction between a private performance of a motion picture in the United States and a public performance overseas. The copyright owner is not vested with the exclusive right either to do or to authorize private or overseas performances. Even as a matter of formal statutory construction, the exemptions from liability for both private and overseas performances arise as negative inferences from the text of Section 106. Private performances of motion pictures are not actionable because the Congress had failed to include such performances among the list of the copyright

owner's exclusive rights. In the same manner, overseas performances are not actionable because the Congress has not chosen to enforce the U.S. copyright laws extraterritorially.

To be sure, the complaint alleges that certain negotiations for foreign television rights were conducted in the United States and that such negotiations constituted acts of authorization. These allegations, however, neglect the central lesson of *Columbia Pictures* that an authorization of a noninfringing activity, such as a private or an overseas performance, is not actionable under the Copyright Act even if the authorization is made in the United States.

Accordingly, the allegations of Danjaq's second amended complaint that Pathe authorized the public performance of Bond films overseas do not state a claim under the U.S. Copyright Act.

The strongest authority cited by Danjaq in contravention of this court's conclusion comes from another Ninth Circuit case decided three years before *Columbia Pictures*. *See Peter Starr Prod. Co. v. Twin Continental Films, Inc., supra*. In *Peter Starr*, the Ninth Circuit held that the district court had subject matter jurisdiction over a claim that the defendant authorized in the United States an overseas exhibition of a copyrighted film. 783 F.2d at 1441–1443. It would be too facile, however, to conclude from this decision that the Ninth Circuit approved the imposition of liability in the circumstances described.

*Peter Starr* addressed itself entirely to the question of subject matter jurisdiction and not to the sufficiency of the claim. Indeed, the Ninth Circuit only recently held that a copyright claim "arises under" federal law on the basis of a well-pleaded complaint. *See Effects Associates, Inc. v. Cohen*, 817 F.2d 72, 73 (9th Cir.1987). Hence, the complaint in *Peter Starr*, alleging authorization within the United States, may have been sufficiently well pleaded so as to arise under the U.S. Copyright Act; the Ninth Circuit has certainly so held. However, in that case the Ninth Circuit was neither presented with nor addressed

**204**

the question, whether the complaint properly arising under federal law also stated a claim for relief under that law. In view of the Ninth Circuit's subsequent decision in *Columbia Pictures* and for reasons stated in this opinion, this court concludes that the complaint in *Peter Starr* and Danjaq's instant complaint, while arising under the U.S. Copyright Act, failed to state a claim for relief under that Act.

Accordingly, Pathe's alleged authorization of noninfringing overseas performances is not actionable under the U.S. Copyright Act. The copyright claim is dismissed under F.R.C.P. 12(b)(6).

IT IS SO ORDERED.