# United States Court of Appeals
## For the First Circuit

No. 04-1934
No. 04-1935

MARÍA VENEGAS-HERNÁNDEZ; GUILLERMO VENEGAS-HERNÁNDEZ;
RAFAEL VENEGAS-HERNÁNDEZ; YERAMAR VENEGAS-VELÁZQUEZ;
GUILLERMO VENEGAS-LLOVERAS, INC.,

Plaintiffs, Appellants/Cross-Appellees,

v.

ASOCIACIÓN DE COMPOSITORES Y EDITORES DE MÚSICA LATINOAMERICANA
(ACEMLA); LATIN AMERICAN MUSIC COMPANY, INC. (LAMCO),

Defendants, Appellees/Cross-Appellants.

v.

PEER; PEER INTERNATIONAL CORPORATION; SOUTHERN MUSIC
COMPANY; LUIS RAÚL BERNARD; JOSÉ L. LACOMBA; LUCY CHÁVEZ-BUTLER,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Boudin, Chief Judge,

Cyr, Senior Circuit Judge,

and Howard, Circuit Judge.

Heath W. Hoglund for plaintiffs, appellants/cross-appellees.
Jane Becker Whitaker with whom Ángel N. Caro was on brief for
defendants, appellees/cross-appellants.

Barry I. Slotnick with whom Jacques M. Rimokh, Loeb & Loeb LLP, Francisco A. Besosa and Adsular Muniz Goyco & Besosa P.S.C. were on brief for defendants, appellees Peer, Peer International Corporation and Southern Music Company.

September 16, 2005

**BOUDIN**, <u>Chief Judge</u>. These consolidated appeals concern both disputes over ownership of interests in certain musical copyrights and claims of infringement against various entities. The musical compositions are those of Guillermo Venegas-Lloveras ("GVL"), a well-known Puerto Rican composer who died in 1993. Because multiple issues are presented, we begin with an overview of background events and pertinent proceedings, reserving details for the discussion of individual claims.

GVL wrote, and obtained copyrights under the Copyright Act for, a large number of compositions. Under the statute, a copyright owner obtains a number of exclusive rights over the copyrighted works for a fixed term, rights that he may license or assign, 17 U.S.C. § 106 (2000). He also obtains a right to renew the copyright for a further term, 17 U.S.C. § 304(a); however, if this renewal right does not vest during the author's lifetime, it passes to his heirs not by will but as specified by the Copyright Act itself. <u>Id.</u> § 304(a)(1)(C).

During his lifetime, GVL granted various rights in his compositions. Of particular importance is a 1952 agreement with Peer, a musical publishing company that acquires such rights and then licenses them to third parties; affiliated with Peer are Peer International Corp. and Southern Music Co. (collectively, "the Peer defendants"). GVL entered into other agreements, a series of which

were made in 1969 with another publisher, PHAM,[1] and yet another in 1970 directly with Peer affiliate Southern Music.

On October 16, 1996, GVL's widow, Lucy Chávez-Butler, assigned all of her copyright interests in GVL's works to Latin American Music Company ("LAMCO"), a New York-based music publisher. One of LAMCO's affiliates is ACEMLA de Puerto Rico, a performance-rights society. Such organizations, among them the well-known entities ASCAP and BMI, obtain rights to musical compositions, license them (often through blanket licenses), and collect royalties from sub-licenses.

A year later, in October 1997, Chávez brought suit in the Superior Court in Puerto Rico to settle a dispute with GVL's four surviving children ("the siblings") as to ownership of copyright interests in GVL's works after his death. Ultimately, in January 2000, the local Court of Appeals of the Commonwealth of Puerto Rico ruled that rights in GVL's works belonged to his children, ostensibly under his will and a later understanding reached between Chávez and the siblings in settling the estate; however, just what rights were so adjudicated is a matter of dispute on this appeal.

Then, in 2001, the present actions were filed in federal district court in Puerto Rico by the siblings. One charged LAMCO, ACEMLA, and three individuals associated with them ("the LAMCO

_____

[1]PHAM, the acronym for Promotora Hispano Americana de Música, was at that time owned by Peer but was no longer so affiliated at the time of the present litigation.

-4-

defendants")--one of whom was Chávez herself--with various acts of copyright infringement as to GVL's works, which the siblings now claimed to own; the other action, thereafter consolidated with the first, made similar charges and other related claims under contract law against the Peer defendants.

In considering the siblings' infringement claims, the district court first decided the ownership, as between Chávez and the siblings, of such renewal-term copyrights as had arisen after GVL's death.  In two decisions, the district court ruled that ownership of such renewal interests had not been resolved in the earlier local litigation and that Chávez and the four siblings each held a 20 percent interest in the copyrights.  Venegas Hernandez v. Peer Int'l Corp., 270 F. Supp. 2d 207, 216-17 (D.P.R. 2003) ("Venegas-Hernandez I"); Venegas-Hernandez v. Peer, 283 F. Supp. 2d 491, 503-05 (D.P.R. 2003) ("Venegas-Hernandez II").

Then, after an extensive bench trial, the district court in 2004 issued a massive seventy-seven-page decision.  Venegas-Hernandez v. Peer, Civil No. 01-1215 (D.P.R. May 19, 2004) ("Venegas-Hernandez III") (unpublished opinion).  In the end, the court awarded $5,000 in damages against the Peer defendants for one act of infringement, rejecting other infringement claims against them; the court rejected as well the siblings' efforts to terminate, by rescission or otherwise, certain rights that the Peer

-5-

defendants obtained under their earlier agreements with GVL himself, including the 1952 contract.

As to the LAMCO defendants, the court rejected LAMCO's claims of ownership as to certain songs and held it liable for just over $16,000 in damages for infringement. However, the court also rejected a number of other infringement claims made by the siblings; importantly, although the court agreed that the LAMCO defendants had licensed certain GVL compositions during periods when they had no right to do so, it found, as to most of their unauthorized licenses, that no evidence of copying or performance had been provided by the siblings.

Now before us are appeals by the siblings and by the LAMCO defendants. The standard of review is de novo for issues of law, clear error for factual findings, and varying degrees of deference on law application, procedural matters, and choice of penalties. Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 82 (1st Cir. 2004); Cavallaro v. United States, 284 F.3d 236, 245 (1st Cir. 2002); Morley Music Co. v. Dick Stacey's Plaza Motel, Inc., 725 F.2d 1, 3 (1st Cir. 1983). We begin with the issue of ownership rights in the renewal terms, then address infringement and contract issues, and conclude with the parties' remaining claims.

Various of the siblings' infringement claims depended on who owned renewal terms for certain GVL works. In 1976, Congress

provided that copyrights still in their original 28-year term as of January 1, 1978, are eligible for a renewal term of 47 years (a term since extended to 67 years under the Sonny Bono Copyright Term Extension Act, Pub. L. No. 105-298, 112 Stat. 2827 (1998)). 3 Nimmer & Nimmer, Nimmer on Copyright § 9.08, at 9-128 to 9-129 (2005) ("Nimmer"). The right to renew belongs to "the author of such work, if the author is still living," but if not, then to "the widow, widower, or children of the author"; if none in this latter group is living, then the rights pass to the author's executor or, absent a will, to "the author's next of kin." 17 U.S.C. § 304(a)(1)(C).

In the district court, the siblings took the position that the renewal terms belonged solely to them,[2] and that the issue had been settled by the local courts and was res judicata against Chávez. The district court, as already noted, held that under the Copyright Act, Chávez retained a 20 percent interest as to renewal terms created after GVL's death. On this issue, the siblings now urge that they own 100 percent of those renewal terms; LAMCO, which acquired whatever interest Chávez might have, argues in its cross-appeal that her interest was 50 percent rather than 20 percent.

_____

[2]As to those renewal terms that had begun before GVL's death, they belonged--under the terms of the statute--to GVL at the time of his death, and neither the Peer nor LAMCO defendants dispute that (given the decision of the Puerto Rico Court of Appeals) they passed solely to the siblings.

We begin with the res judicata issue. Whether one speaks of claim or issue preclusion, the outcome turns in this slightly unusual situation on exactly the same question: whether, when the local Court of Appeals said that authorship rights to GVL's musical works belonged (under his will and a subsequent agreement between the siblings and Chávez) entirely to the siblings, the court intended to embrace renewal rights that had not come into being at the time of GVL's death or only those original copyrights and renewal terms that were in force and belonged to him at the time of his death.

The district court concluded that the state courts had not addressed or resolved the question of the unmatured renewal rights, which, it said, did not pass by will but were created and assigned by virtue of the Copyright Act, see Venegas I, 270 F. Supp. 2d at 214-16; Venegas II, 283 F. Supp. 2d at 496-97; as for the agreement between the siblings and Chávez governing the division of the estate, the district court found from the evidence that neither side had intended the agreement to cover renewal rights unmatured at GVL's death--a subject that (the district court said) they had not even considered in making their agreement. Id. at 497-503.

One might have expected on this appeal that the siblings would urge that the district court had misinterpreted the local court decisions, the agreement between the siblings and Chávez, or

-8-

both.  But in the siblings' opening brief, there is no serious attempt to parse the local decisions, nor any attempt to interpret the agreement in light of its language and what the parties said or intended.

Instead, the siblings' brief argues primarily that the renewal rights must pass under Puerto Rico law in the absence of a direct conflict with the Copyright Act.  Secondarily, the siblings suggest that to treat the renewal terms arising after the author's death as something other than his property would violate the Constitution's copyright clause, U.S. Const. art. 1, § 8, cl. 8, because the clause allows Congress to secure to "authors"--not anyone else--the fruits of their authorial work.  To create rights other than in the author, say the siblings, is at odds with the Constitution.

The statutory argument is defeated by the statute itself, which says that if the author is not alive when the renewal term begins, then the right to renew belongs to his wife and children. 17 U.S.C. § 304(a)(1)(C)(ii).  Only "if such author, widow, widower, or children are not living" do the rights to renew pass to "the author's executors," id. § 304(a)(1)(C)(iii)--presumably for disposition in accordance with his will (an inference reinforced by a final direction saying that "the author's next of kin" inherit "in the absence of a will," id. § 304(a)(1)(C)(iv)).

If there were any doubt, it appears to be removed by De Sylva v. Ballentine, 351 U.S. 570 (1956), the leading Supreme Court decision addressing the clause at issue. There, in deciding whether the renewal rights (not matured during the author's lifetime) belonged to the widow alone or to both the widow and children, the Court made no reference to any possible will and went out of its way to say that "the author cannot assign his family's renewal rights" and that the statute imposes "a compulsory bequest" so as "to provide for the family of the author after his death." Id. at 582.[3]

As to the constitutional objection, the Supreme Court in De Sylva apparently did not see any patent constitutional objection to this "compulsory bequest." More recently, it stressed in a different context the broad scope of Congress' power to implement expansively the copyright clause of the Constitution. Eldred v. Ashcroft, 537 U.S. 186, 212-13 (2003). In all events, the siblings' brief does little more than cite the "Authors" language in the clause, and it would take a far more developed argument for us to take seriously a constitutional attack of this kind.

This brings us to the truly difficult question as to whether the renewal interest is divided 50-50 between the widow and

_____

[3]See also Miller Music Corp. v. Charles N. Daniels, Inc., 362 U.S. 373, 375 (1960) (stating that the author possesses "only an expectancy to assign [renewal rights,] and his death, prior to the renewal period, terminates his interest in the renewal which by § 24 [now § 304(a)] vests in the named classes" (emphasis added)).

-10-

children or per capita so that the widow and each of the four children would get a 20 percent interest. The Supreme Court in De Sylva expressly declined to decide the issue. De Sylva, 351 U.S. at 582. The Sixth Circuit, the only circuit court squarely to address it, split, with the majority favoring the 50-50 solution, Broadcast Music, Inc. v. Roger Miller Music, Inc., 396 F.3d 762, 781-82 (6th Cir. 2005), petition for cert. filed (U.S. June 30, 2005) (No. 05-31), and the dissent supporting the per capita view adopted by the district court in this case, id. at 783-84 (Daughtrey, J., dissenting). (Earlier, the Second Circuit had assumed a per capita division, Bartok v. Boosey & Hawkes, Inc., 523 F.2d 941 (2d. Cir. 1975), but the issue was scarcely discussed and "[a]t best . . . Bartok contains no more than dicta on this issue." 3 Nimmer § 9.04, at 9-29).

There are good arguments on both sides. The phrase "widow . . . or children" is opaque as to the division between them; indeed, in De Sylva, arguments both ways could be made as to whether the children should have any rights at all if the widow were still living. 351 U.S. at 573. On the other hand, De Sylva's conclusion that "both [widow and children] succeed to the renewals as members of the same class," id. at 582, not only rejects the widow-only position, but might be taken to suggest that widow and children succeed per capita, and some read it in this manner. Broadcast Music, 396 F.3d at 783-84 (Daughtrey, J., dissenting).

-11-

One should not attribute too much to a single phrase in a Supreme Court opinion that squarely refused to decide the apportionment issue. The "class" reference was made in deciding whether the children had <u>any</u> interest at all if the widow were alive, and the word "class" was in substance a shorthand way of saying that the widow and children inherit together (if both are alive) rather than sequentially (that is, the children inherit only if the widow is not alive). The word "class" is not used in the statute and, however the Supreme Court someday decides the issue, we take it at its word in saying that it has not done so yet.

Pertinent to the open question is language in adjacent statutory provisions that deal with termination interests in copyrights; they are relevant because Congress there specified that "the widow or widower owns one-half of the author's interest" if "there are any surviving children or grandchildren of the author." 17 U.S.C. § 304(c)(2)(A). Chávez can point to this as a template for resolving this case in the same way; the siblings can argue that it would have been easy for Congress to use the same language here. The provision is arguably more helpful to Chávez; the opposite inference would be stronger if the provisions had been drafted together.[4]

_____

[4]The renewal provisions in section 304(a) simply carried forward language whose substance dates back to the Copyright Act of 1909. <u>See</u> Act of March 4, 1909, 35 Stat. 1075, 1080-81; H.R. Rep. No. 94-1476, at 139 (1976), <u>reprinted in</u> 1976 U.S.C.C.A.N. 5659, 5755 (noting that "the [1976] bill preserves the language of the

-12-

Policy considerations favor the 50-50 solution over per capita division. As De Sylva notes, the compulsory bequest is to care for widow and children. 351 U.S. at 582. A majority of states give the widow a 50 percent or greater interest in her husband's estate if he dies intestate, even with multiple children, see Restatement (Third) of Property: Wills and Other Donative Transfers § 2.2 statutory notes 1-3 (1999); this is hardly a surprising allocation, since ordinarily the widow will herself have a duty to support children still in their minority, and children in their majority ordinarily have earning power of their own.

A third solution--urged by neither party--would be to adopt the intestacy provisions of local law. Although we are construing a federal statute, such statutes can be read to incorporate local law, see Chemerinsky, Federal Jurisdiction § 8.11, at 582-83 (4th ed. 2003), and that temptation is especially strong where domestic relations issues are presented. De Sylva followed this course on the issue of who constituted a "child" of the author. 351 U.S. at 580-81. Yet the termination provisions of section 304(c) do provide a competing uniform federal template.

Neither side in this case has urged adoption of Puerto Rico law, whose substantive rules as to a widow's intestate share are far from straightforward. See 31 L.P.R.A. §§ 2641-2693;

present renewal provision without any change in substance"). The termination provisions of section 304(c), on the other hand, were first introduced in the 1976 Act.

Efraín González Tejera, Mortis Causa Wealth Transfer and the Protection of the Family: The Spanish-Puerto Rican Experience, 60 Tul. L. Rev. 1231, 1236-39 (1986). We do not rule out the possibility of such a solution if and when the issue is briefed in a future case, but neither do we say that we would necessarily endorse such an approach. On the choice that has been presented to us, the 50-50 solution is superior to the per capita one and, incidentally, avoids an unnecessary split with the Sixth Circuit.

In the district court, the siblings made a number of infringement claims against both the Peer and LAMCO defendants based upon various acts pertaining to a number of different songs. Some, but not all, depended in part on who owned the copyright to one or more pieces during the period of the alleged infringement; ownership is an issue properly before the court in an infringement case since "[t]o make out a copyright infringement, a plaintiff must show ownership of a valid copyright . . . ." Matthews v. Freedman, 157 F.3d 25, 26 (1st Cir. 1998).

We address in order the issues framed by the two appeals before us. The first one concerns infringement claims by the siblings against Peer as to songs of GVL owned by Peer under the 1952 agreement. Under the terms of the agreement, GVL assigned to Peer the copyrights to all compositions he had written in the past or would write during the term of the agreement, in exchange for

specified royalties. The agreement continued in force until mid-1964, so songs composed after that date are not covered.

The siblings urged in the district court that Peer's rights in the pre-1964 compositions had been forfeited by Peer mainly because it had not paid royalties to the siblings after GVL's death--the right to the royalties having been inherited by the siblings as heirs to GVL's rights under the 1952 agreement. The district court held that the statute of limitations had run on the claim and that in any case it was without merit. The latter ground is less intricate and sufficient to sustain the district court.

The main attack on Peer's ownership of rights under the 1952 agreement is framed by the siblings as a right to rescind the 1952 agreement on account of the failure to pay royalties after GVL's death. The district court found that Peer had paid royalties pursuant to the 1952 agreement until GVL's death in 1993, when it ceased to make payments in light of the underlying ownership dispute between the siblings and Chávez. This in turn made it uncertain what amounts were owed to the siblings.

Under New York law, which the 1952 agreement specifies as governing, rescission is an equitable remedy for breach of contract; but ordinarily it requires breaches of "so material and substantial a nature that they affect the very essence of the contract and serve to defeat the object of the parties." Nolan v.

Williamson Music, Inc., 300 F. Supp. 1311, 1317 (S.D.N.Y. 1969). Furthermore, "[i]f the party who seeks rescission has an adequate remedy at law, ordinarily he is not entitled to rescind." Callanan v. Powers, 92 N.E. 747, 752 (N.Y. 1910).

The district court found that the delay in paying royalties was not an equitable basis for undoing the entire agreement, which had been carried out by royalty payments from 1952 to 1993, and that contract damages would make the siblings whole. The amount appears to have been modest; Peer says that between 1993 and the trial, only about $3,000 in royalties had accumulated under the 1952 agreement. It adds that it had offered to pay royalties to the siblings in exchange for a hold-harmless agreement-- presumably to protect it against possible claims by Chávez that part of the royalties belonged to her.

The siblings spend only a few paragraphs of their main brief on appeal to challenge this determination, mainly complaining that Peer should have paid them something and that Peer was uncooperative in providing information until discovery in the present lawsuit. They do not dispute that the district court's decision is an exercise of equitable discretion to be reviewed with deference on appeal. Delaney v. Matesanz, 264 F.3d 7, 13-14 (1st Cir. 2001). Against the background events already described, the siblings' spare assertions of error are no basis for overturning the district court's equitable judgment.

The second, and larger, issue raised by the siblings concerns acts of alleged infringement. This presents at the outset its own threshold question, which could be of continuing importance: whether a music publisher's unauthorized grant of a license to a third party to perform or copy a copyrighted work is an act of infringement where there is no adequate proof that the third party ever undertook an infringing act (for example, by performing or recording a copyrighted song).

Often this threshold question will not matter, because ordinarily the plaintiff aims to recover damages and, if they cannot be proved, the suit often will not be brought. But if wrongful authorization alone were infringement, statutory damages might be available without proof of copying, and occasionally harm might be done by such an improper authorization even without a further infringing act--for example, it might discourage the purported licensee from seeking a license from the copyright's true owner.

Looking only at the statutory language, one might think that authorization alone could well be "infringement." Section 106 provides that the copyright owner "has the exclusive rights to do and to authorize any of the following:" and then lists infringing acts such as reproducing, recording, or performing the work. Section 501(a) says, inter alia, that "[a]nyone who violates any of the exclusive rights" provided in section 106 (among other

sections) is an infringer. Section 504(a) provides that "an infringer" is liable for actual or statutory damages.

Because the right to "authorize" is literally one of the exclusive rights provided in section 106, the authorizing person could (as a matter of language) be treated as an infringer subject to statutory damages even if no listed infringing act (for example, performance) actually occurred. Yet the legislative origins of the "authorize" language in the statute arguably support a narrower reading, and most (perhaps all) courts that have considered the question have taken the view that a listed infringing act (beyond authorization) is required for a claim. See II Goldstein, Copyright § 6.3.2, at 6:44 (2d ed. 2005).

The "authorize" reference was added to the statute via the 1976 Copyright Act. Danjaq, S.A. v. MGM/UA Commc'ns, Co., 773 F. Supp. 194, 201 (C.D.Ca. 1991). Prior to that time, the courts had adopted a concept of "contributory infringement" to impose liability on someone who wrongfully authorized an infringing act by another who then committed that act. E.g., Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971). Thus the concept of infringement was expanded by creating a kind of abettor liability for one deemed to have caused the infringing act committed by the wrongfully authorized person. This was hardly revolutionary; doing something forbidden by proxy can lead to liability under both criminal and ordinary tort law. See

-18-

2 Lafave, <u>Substantive Criminal Law</u> § 13.4, at 372-73 (2d ed. 2003); <u>Prosser and Keeton on Torts</u> § 69 at 499-501 (5th ed. 1984).

When the new statutory language was added, the House report explained that "[u]se of the phrase 'to authorize' is intended to avoid any questions as to the liability of contributory infringers."  H.R. Rep. No. 94-1476, at 61 (1976), <u>reprinted in</u> 1976 U.S.C.C.A.N. 5659, 5674.  If the language's purpose was simply to codify the preexisting abetting doctrine that made an authorizer liable for the authorized party's wrongful act of infringement, arguably the drafters did not intend to create an independent liability for authorizing where no listed infringing act, such as performance, thereafter occurred.

It has also been said, in support of this limiting interpretation, that state law provides ample remedies where there is an unlawful authorization that causes harm without a listed infringing act.  For example, if the authorizing entity collected a flat payment regardless of copying or performance, a state claim for unjust enrichment might lie, <u>Restatement of Restitution</u> § 1 (1937); and if the authorization undercut efforts of the true owner to license the copyright, the true owner might sue for interference with contractual or advantageous economic relationships.  <u>See</u> 3 <u>Nimmer</u> § 12.04, at 12-91 & n.85 (2005).

There would be nothing remarkable about such a splintering of enforcement between federal and state law.  The

Copyright Act does not draw into federal court all matters that pertain to copyright; a simple dispute over who owns a copyright is usually governed by state law and would not, absent diversity jurisdiction, even be heard in federal court if it were the only issue in the case. See T.B. Harms Co. v. Eliscu, 339 F.2d 823, 826-27 (2d Cir. 1964), cert. denied, 381 U.S. 915 (1965). In this very case, the secondary dispute over ownership is resolved in federal court only as a byproduct of the infringement claims.

Admittedly, the better bare-language reading would allow the claims in question; they might add some slight protection to federal copyright interests, at the cost of more federal litigation. But the narrower interpretation appears from legislative history to be closer to congressional intent and has been followed by other courts. Occasionally, and we think this true here, the case is so close and the stakes low enough that maintaining uniformity tips the balance.

This interpretation leads us to affirm the district court's ruling rejecting several of the siblings' infringement claims against the Peer and LAMCO defendants. In a number of instances, the district court found that a publisher defendant had granted a license, sometimes as part of a blanket license of many songs, that included rights as to GVL works that were no longer within the publisher's own rights portfolio--for example, because

the copyright had entered its renewal period and the renewal period rights belonged to the widow and siblings.

But the court also found that there was no proof that the songs had been copied or performed under the mistaken licenses. The siblings' position is that the mere fact of licensing creates a presumption that the works were the subject of infringing acts, but this ignores the reality that licensees often seek broad licenses covering a range of works, allowing them to choose what to use. Depending upon the surrounding circumstances, an inference that a work was performed might be stronger or weaker, but a universal presumption is not justified.

As for the specific circumstances of the rejected claims in this case, the siblings say that LAMCO authorized, and was paid for, a mechanical license to Sonolux for two songs and that this proves that the infringing acts occurred pursuant to the license. The siblings also say that Peer, through BMI, authorized the broadcast in the United States of a GVL song, and that the online database showed this as a licensed song. In both instances, it is uncontested that LAMCO and Peer had no rights to license during the period in question.

However, in each case there is no direct proof of an infringing act after the authorization. Whether the listed infringing acts were proved--apart from mere authorization--is a factual issue and our review is for clear error. Cariglia, 363

F.3d at 82. The Sonolux payment was refunded, and BMI listing a song as authorized does not mean it was played. The siblings' brief on appeal does not spend much time explaining why its inference of infringement is compelling, and we see no reason for setting aside the district court's fact-specific judgment.

A different problem is presented by yet another infringement claim by the siblings. In 1993, Banco Popular de Puerto Rico ("the bank") used GVL's composition Génesis in CDs and videos during the original copyright term, which had been inherited by the siblings. The siblings sued LAMCO for contributory infringement based on a retroactive mechanical license it issued to the bank in 1998, under which the bank paid $16,373.47 to LAMCO; the district court awarded this amount to the siblings. The siblings also sued because of a retroactive performance license issued to the bank by ACEMLA, an affiliate of LAMCO; the court, however, found insufficient evidence of performance and awarded no damages.

On appeal, the siblings argue that they should have been awarded additional damages based on the retroactive performance license. They contend that an infringing performance should be assumed in light of the understanding that Génesis was used in connection with the bank's 1993 "Christmas Special" and the fact that the bank paid for a retroactive performance license five years later. While it may very well be that one who understands the

details of the 1993 "Christmas Special" could presume that an unauthorized performance of Génesis had taken place, the siblings in their briefs fail to proffer even a basic explanation of what the alleged performance entailed. Given so undeveloped an argument, we will not disturb the district court's finding.

LAMCO, on the other hand, argues that the court erred in awarding $16,373.47 in damages based on the retroactive mechanical license because any 1993 infringement by the bank was outside of the statute of limitations when LAMCO issued the retroactive license in 1998, adding that the retroactive license was sought and granted for reasons unrelated to the bank's concern about liability for its 1993 acts. In LAMCO's view, there was thus no "infringement" to be cured via the retroactive license and it cannot be found liable for contributory infringement.

Fitting agency concepts like "retroactive authorization" into copyright law provides plenty of room for debate; obviously a license in 1998 did not "cause" a 1993 infringement. But LAMCO does not pursue this interesting point, relying instead on a statute of limitations argument, and the discussion in the briefs is too sparse to justify any serious attempt to develop principles in this recherché area of copyright law.

In their reply brief, dated March 1, 2005, the siblings cited numerous documents to support their contention that LAMCO never raised the statute of limitations argument at trial. LAMCO's

own reply brief, filed on March 16, 2005, offered no rebuttal to the siblings' argument. Whether or not LAMCO made the argument in the district court, it has not countered the siblings' waiver claim. It is worth adding that LAMCO's brief does not furnish information we would need if we were to resolve the statute of limitations argument on the merits.

LAMCO has one further claim on its cross-appeal. It claims that it owned, and the siblings therefore did not inherit, the original GVL copyright terms for eleven songs that appear on a spreadsheet, signed by GVL, which states: "I CERTIFY: Those works detailed above belong to me, Guillermo Venegas Lloveras. Founder member of SPACEM." The district court said that this was insufficient to establish an assignment to LAMCO and that LAMCO had failed to offer contextual evidence to prove otherwise.

On appeal, LAMCO points to testimony from an official of SPACEM that the signing of the spreadsheet was part of an intended transfer by GVL to LAMCO and to testimony that LAMCO treated at least some of the songs as its own. But the Copyright Act requires a written transfer of ownership, "or a note or memorandum of the transfer," 17 U.S.C. § 204(a); whether or not a cryptic document could ever qualify, the district court was reasonable in concluding that the document failed to effect a transfer of ownership rights.

There are a few loose-end arguments, such as a claim by the siblings that the district court committed an abuse of

discretion in failing to award sufficient statutory damages for one of the infringements. Such arguments have been considered but do not require additional discussion. The district court has ably managed a case with an unusually garbled record and disparate claims.

We <u>affirm</u> the district court on all issues raised by the appeals of the siblings and LAMCO, save that we agree with LAMCO that, as between a 50-50 share and a per capita allocation under section 304(a)(1)(C), GVL's widow is entitled to 50 percent and the siblings as a group to 50 percent. On that single issue, we <u>vacate</u> and <u>remand</u> for any further proceedings that may be required and a modification of the judgment. Each party to bear their own costs on appeal.

<u>It is so ordered.</u>