**SUBAFILMS, LTD.; The Hearst Corp., Plaintiffs-counter-defendants-Appellees,**

v.

**MGM–PATHE COMMUNICATIONS CO., fka MGM/UA Communications Co. and as United Artists Corporation; MGM/UA Home Video, Inc.; Warner Home Video, Inc.; Warner Bros. Inc., Defendants-counter-claimants-Appellants.**

**SUBAFILMS, LTD.; The Hearst Corp., Plaintiffs–Appellants,**

v.

**MGM–PATHE COMMUNICATIONS CO., fka MGM/UA Communications Co. and as United Artists Corporation; MGM/UA Home Video, Inc.; Warner Home Video, Inc.; Warner Bros. Inc.; United Artists Corporation, Defendants–Appellees.**

Nos. 91–56248, 91–56379 and 91–56289.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 24, 1994.

Decided May 13, 1994.

Louis P. Petrich, Leopold, Petrich & Smith, Los Angeles, CA, for defendants-counter-claimants-appellants United Artists Corp., MGM/UA Communications Co., MGM/UA Home Video, Inc., Warner Bros., Inc., and Warner Home Video, Inc.

Bertram Fields, Greenberg, Glusker, Fields, Claman & Machtinger, Los Angeles, CA, for plaintiffs-counter-defendants-appellees Subafilms, Ltd. and The Hearst Corp.

Before: WALLACE, Chief Judge, and BROWNING, TANG, POOLE, D.W. NELSON, BEEZER, HALL, BRUNETTI, KOZINSKI, THOMPSON and LEAVY, Circuit Judges.

Opinion by Judge D.W. NELSON.

D.W. NELSON, Circuit Judge:

In this case, we consider the "vexing question"[1] of whether a claim for infringement can be brought under the Copyright Act, 17 U.S.C. § 101 et seq. (1988), when the assertedly infringing conduct consists solely of the authorization within the territorial boundaries of the United States of acts that occur entirely abroad. We hold that such allegations do not state a claim for relief under the copyright laws of the United States.

## Factual and Procedural Background

In 1966, the musical group The Beatles, through Subafilms, Ltd., entered into a joint venture with the Hearst Corporation to produce the animated motion picture entitled "Yellow Submarine" (the "Picture"). Over the next year, Hearst, acting on behalf of the joint venture (the "Producer"), negotiated an agreement with United Artists Corporation ("UA") to distribute and finance the film. Separate distribution and financing agreements were entered into in May, 1967. Pursuant to these agreements, UA distributed the Picture in theaters beginning in 1968 and later on television.

In the early 1980s, with the advent of the home video market, UA entered into several licensing agreements to distribute a number of its films on videocassette. Although one company expressed interest in the Picture, UA refused to license "Yellow Submarine" because of uncertainty over whether home video rights had been granted by the 1967 agreements. Subsequently, in 1987, UA's successor company, MGM/UA Communications Co. ("MGM/UA"), over the Producer's objections, authorized its subsidiary MGM/UA Home Video, Inc. to distribute the Picture for the domestic home video market, and, pursuant to an earlier licensing agreement, notified Warner Bros., Inc. ("Warner") that the Picture had been cleared for international videocassette distribution. Warner, through its wholly owned subsidiary, Warner Home Video, Inc., in turn entered into agreements with third parties for distribution of the Picture on videocassette around the world.

In 1988, Subafilms and Hearst ("Appellees") brought suit against MGM/UA, Warner, and their respective subsidiaries (collectively the "Distributors" or "Appellants"), contending that the videocassette distribution of the Picture, both foreign and domestic, constituted copyright infringement and a breach of the 1967 agreements. The case was tried before a retired California Superior Court Judge acting as a special master. The special master found for Appellees on both claims, and against the Distributors on their counterclaim for fraud and reformation. Except for the award of prejudgment interest, which it reversed, the district court adopted all of the special master's factual findings and legal conclusions. Appellees were awarded $2,228,000.00 in compensatory damages, split evenly between the foreign and domestic home video distributions. In addition, Ap-

---

**1.** 1 Paul Goldstein, Copyright: Principles, Law and Practice § 6.1, at 705 n. 4 (1989).

pellees received attorneys' fees and a permanent injunction that prohibited the Distributors from engaging in, or authorizing, any home video use of the Picture.

A panel of this circuit, in an unpublished disposition, affirmed the district court's judgment on the ground that both the domestic and foreign distribution of the Picture constituted infringement under the Copyright Act. *See Subafilms, Ltd. v. MGM–Pathe Communications Co.,* Nos. 91–56248, 91–56379, 91–56289, 1993 WL 39269 (9th Cir. Feb. 17, 1993).[2] With respect to the foreign distribution of the Picture, the panel concluded that it was bound by this court's prior decision in *Peter Starr Prod. Co. v. Twin Continental Films, Inc.,* 783 F.2d 1440 (9th Cir.1986), which it held to stand for the proposition that, although " 'infringing actions that take place entirely outside the United States are not actionable' [under the Copyright Act, an] 'act of infringement within the United States' [properly is] alleged where the illegal *authorization* of international exhibitions *t[akes] place in the United States," Subafilms,* slip op. at 4917–18 (quoting *Peter Starr,* 783 F.2d at 1442, 1443 (emphasis in original) (alterations added)). Because the Distributors had admitted that the initial authorization to distribute the Picture internationally occurred within the United States, the panel affirmed the district court's holding with respect to liability for extraterritorial home video distribution of the Picture.[3]

We granted Appellants' petition for rehearing en banc to consider whether the panel's interpretation of *Peter Starr* conflicted with our subsequent decision in *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.,* 964 F.2d 965 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1582, 123 L.Ed.2d 149 (1993), which held that there could be no

liability for authorizing a party to engage in an infringing act when the authorized "party's use of the work would not violate the Copyright Act," *id.* at 970; *see also Columbia Pictures Indus., Inc. v. Professional Real Estate Investors, Inc.,* 866 F.2d 278, 279–81 (9th Cir.1989) (holding that a hotel was not liable under the Copyright Act for making available videodisc players for in-room viewing), *rev'd on other grounds,* —— U.S. ——, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). Because we conclude that there can be no liability under the United States copyright laws for authorizing an act that *itself* could not constitute infringement of rights secured by those laws, and that wholly extraterritorial acts of infringement are not cognizable under the Copyright Act, we overrule *Peter Starr* insofar as it held that allegations of an authorization within the United States of infringing acts that take place entirely abroad state a claim for infringement under the Act. Accordingly, we vacate the panel's decision in part and return the case to the panel for further proceedings.

## Discussion

I. The Mere Authorization of Extraterritorial Acts of Infringement does not State a Claim under the Copyright Act

■ As the panel in this case correctly concluded, *Peter Starr* held that the authorization within the United States of entirely extraterritorial acts stated a cause of action under the "plain language" of the Copyright Act. *Peter Starr,* 783 F.2d at 1442–43. Observing that the Copyright Act grants a copyright owner "the *exclusive rights* to do and *to authorize*" any of the activities listed in 17 U.S.C. § 106(1)–(5), *id.* at 1442 (empha-

---

**2.** Because the panel found that the district court's judgment could be sustained solely on the basis of a violation of the Copyright Act, the panel declined to reach the alternative breach of contract theory relied upon by the district court and special master.

**3.** At oral argument before this court Appellants' counsel conceded that the relevant authorization occurred within the United States. Counsel for Appellees, accepting this concession, additionally insisted that the authorization necessarily includ-

ed the making of a copy of the negative of the Picture within the United States. Appellants' counsel responded that this contention was made before neither the special master nor the panel, and was not supported by the record. For the purposes of this decision, we assume, as apparently the panel did, that each of the defendants made a relevant "authorization" within the United States, and that the acts of authorization consisted solely of entering into licensing agreements.

sis in original),[4] and that a violation of the "authorization" right constitutes infringement under section 501 of the Act, the *Peter Starr* court reasoned that allegations of an authorization within the United States of extraterritorial conduct that corresponded to the activities listed in section 106 "allege[d] an act of infringement within the United States," *id.* at 1442–43. Accordingly, the court determined that the district court erred "in concluding that 'Plaintiff allege[d] only infringing acts which took place outside of the United States,'" and reversed the district court's dismissal for lack of subject matter jurisdiction. *Id.* at 1443.[5]

The *Peter Starr* court accepted, as does this court,[6] that the acts *authorized* from within the United States themselves could not have constituted infringement under the Copyright Act because "[i]n general, United States copyright laws do not have extraterritorial effect," and therefore, "infringing actions that take place entirely outside the United States are not actionable." *Peter Starr*, 783 F.2d at 1442 (citing *Robert Stigwood Group, Ltd. v. O'Reilly*, 530 F.2d 1096, 1101 (2d Cir.), *cert. denied*, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976)). The central premise of the *Peter Starr* court, then, was that a party could be held liable as an "infringer" under section 501 of the Act merely for authorizing a third party to engage in acts that, had they been committed *within* the United States, would have violated the exclusive rights granted to a copyright holder by section 106.

---

**4.** Section 106 of the Copyright Act provides:

Subject to sections 107 through 120, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works ... to display the copyrighted work publicly.

17 U.S.C.A. § 106 (West Supp.1992).

**5.** Appellants, relying *inter alia* on *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), insist that *Peter Starr* should be limited to its holding relating to subject matter jurisdiction and that any intimation by the court that the plaintiff stated a valid cause of action should be disregarded as dicta. *See also Danjaq, S.A. v. MGM/UA Communications, Co.*, 773 F.Supp. 194, 203 (C.D.Cal.1991) (so interpreting *Peter Starr*), *aff'd on other grounds*, 979 F.2d 772 (9th Cir.1992). We do not read *Peter Starr* in this manner. Appellants undoubtedly are correct that the existence of subject matter jurisdiction under 28 U.S.C. § 1338(a) is distinct as a general matter from the question of whether a valid cause of action is stated. *See, e.g., Effects Assocs., Inc. v. Cohen*, 817 F.2d 72, 73 (9th Cir. 1987) (quoting *T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 828 (2d Cir.1964) (Friendly, J.), *cert. denied*, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965)), *cert. denied*, 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1086 (1991). However, the *Peter Starr* court treated the jurisdictional inquiry as *dependent* on whether "[t]he complaint ... allege[d] an act of infringement in the United States," *Peter Starr*, 783 F.2d at 1443, and expressly concluded that allegations of an invalid "authorization" "state[] a cause of action [for infringement] under the plain language" of the Copyright Act, *id.* at 1442–43. Even if the *Peter Starr* court erred in framing the subject matter jurisdiction inquiry as coextensive with the question of whether the allegations in the complaint stated a good cause of action, a question we do not decide, *cf. Hartford Fire Ins. Co. v. California*, —— U.S. ——, ———— ——, 113 S.Ct. 2891, 2917–18, 125 L.Ed.2d 612 (1993) (Scalia, J., dissenting in relevant part) (asserting that the question of the extraterritorial reach of the Sherman Act "has nothing to do with the jurisdiction of the courts" but is a question of "legislative jurisdiction"), it undoubtedly held that a claim had been stated. Indeed, most courts have read *Peter Starr* in precisely this manner. *See, e.g., Update Art, Inc. v. Modiin Publishing, Ltd.*, 843 F.2d 67, 72–73 (2d Cir.1988) (concluding that subject matter jurisdiction existed because the plaintiffs "stated a claim fully cognizable under the copyright laws" by alleging a predicate act of infringement within the United States); *ITSI T.V. Prods., Inc. v. California Auth. of Racing Fairs*, 785 F.Supp. 854, 863–64 (E.D.Cal.1992) (explaining that the *Peter Starr* court "was required to address both jurisdiction and [the sufficiency of the claim] in the course of disposition" because "the jurisdictional question and the merits [were] intertwined"), *rev'd on other grounds*, 3 F.3d 1289 (9th Cir.1993).

**6.** We reaffirm below that the Copyright Act does not extend to acts of infringement that take place entirely abroad. *See infra* Part II.

Since *Peter Starr*, however, we have recognized that, when a party authorizes an activity *not* proscribed by one of the five section 106 clauses, the authorizing party cannot be held liable as an infringer. In *Lewis Galoob*, we rejected the argument that "a party can unlawfully authorize another party to use a copyrighted work even if that party's use of the work would not violate the Copyright Act," *Lewis Galoob*, 964 F.2d at 970, and approved of Professor Nimmer's statement that " 'to the extent that an activity does not violate one of th[e] five enumerated rights [found in 17 U.S.C. § 106], authorizing such activity does not constitute copyright infringement,' " *id.* (quoting 3 David Nimmer & Melville B. Nimmer, Nimmer on Copyright § 12.04[A][3][a], at 12–80 n. 82 (1991)). Similarly, in *Columbia Pictures*, we held that no liability attached under the Copyright Act for providing videodisc players to hotel guests when the use of that equipment did not constitute a "public" performance within the meaning of section 106 of the Act, *see Columbia Pictures*, 866 F.2d at 279–81.

The apparent premise of *Lewis Galoob* was that the addition of the words "to authorize" in the Copyright Act was not meant to create a new form of liability for "authorization" that was divorced completely from the legal consequences of authorized conduct, but was intended to invoke the preexisting doctrine of contributory infringement. *See Lewis Galoob*, 964 F.2d at 970 ("Although infringement by authorization is a form of direct infringement [under the Act], this does not change the proper focus of our inquiry; a party cannot authorize another party to infringe a copyright unless the authorized conduct would itself be unlawful."). We agree.

Contributory infringement under the 1909 Act developed as a form of third party liability. Accordingly, there could be no liability for contributory infringement unless the authorized or otherwise encouraged activity itself could amount to infringement. *See, e.g., Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir.1971) ("[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the *infringing conduct of another*, may be held liable as a 'contributory' infringer." (emphasis added)); *cf. Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 526, 92 S.Ct. 1700, 1706, 32 L.Ed.2d 273 (1972) ("But it is established that there can be no contributory infringement without the fact or intention of a direct infringement. 'In a word, if there is no [direct] infringement of a patent there can be no contributory infringer.' " (quoting *Mercoid Corp. v. Mid–Continent Inv. Co.*, 320 U.S. 661, 677, 64 S.Ct. 268, 276, 88 L.Ed. 376 (1944) (Frankfurter, J., dissenting on other grounds) (alteration added by *Deepsouth* Court))).[7] *See generally* 1 Paul Goldstein, Copyright: Principles, Law and Practice § 6.1, at 705 (1989) [hereinafter Goldstein] ("It is definitional that, for a defendant to be held contributorily ... liable, a direct infringement must have occurred."); 3 David Nimmer & Melville B. Nimmer, Nimmer on Copyright § 12.04[A][2][b], at 12–81 (1993) [hereinafter Nimmer] ("There can, by definition, be no contributory liability if that conduct which is aided by the putative contributory infringer is not itself infringing."). Indeed, the Supreme Court in *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), although expressly noting that it addressed an extraordinary claim of vicarious or contributory infringement under the 1976 Act for which there was "no precedent in the law of copyright," *id.* at 439, 104 S.Ct. at 787, inquired whether the machines sold by Sony ultimately were capable of a "substantial *noninfringing* use[ ]," *id.*, at 442, 104 S.Ct. at

---

7. In *Deepsouth*, the Court held that the shipment overseas of materials that, when assembled in combination, violated a United States patent, did not result in liability for contributory infringement. *See Deepsouth*, 406 U.S. at 526–29, 92 S.Ct. at 1706–07. Although Congress subsequently reversed this decision by statute, *see* Patent Law Amendments of 1984, Pub.L. No. 98–622, § 101, 98 Stat. 3383, 3383 (1984) (codified as amended at 35 U.S.C.A. § 271(f) (West Supp. 1992)), the case strongly supports our view, discussed below, that under the Copyright Act, for which no similar legislation has been passed, liability for contributory infringement cannot be based on an infringement that takes place overseas. *Cf. Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 & n. 19, 104 S.Ct. 774, 787 & n. 19, 78 L.Ed.2d 574 (1984) (drawing upon the patent laws in analyzing a contributory infringement claim brought under the Copyright Act because of "the historic kinship between patent law and copyright law").

789 (emphasis added); *see also Cable/Home Communication Corp. v. Network Productions, Inc.,* 902 F.2d 829, 845 (11th Cir.1990) ("Contributory infringement necessarily must follow a finding of direct or primary infringement.").

■ As the Supreme Court noted in *Sony,* and this circuit acknowledged in *Peter Starr,* under the 1909 Act courts differed over the *degree* of involvement required to render a party liable as a contributory infringer. *See Sony,* 464 U.S. at 437–38 & n. 18, 104 S.Ct. at 786–87 & n. 18; *Peter Starr,* 783 F.2d at 1443. Viewed with this background in mind, the addition of the words "to authorize" in the 1976 Act appears best understood as merely clarifying that the Act contemplates liability for contributory infringement, and that the bare act of "authorization" can suffice. This view is supported by the legislative history of the Act:

> The exclusive rights accorded to a copyright owner under section 106 are "to do and to authorize" any of the activities specified in the five numbered clauses. *Use of the phrase "to authorize" is intended to avoid any questions as to the liability of contributory infringers.* For example, a person who lawfully acquires an authorized copy of a motion picture would be an infringer if he or she engages in the business of renting it to others for purposes of unauthorized public performance.

H.R.Rep. No. 1476, 94th Cong., 2d Sess. 61, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5674 (emphasis added).

Consequently, we believe that " 'to authorize' [wa]s simply a convenient peg on which Congress chose to hang the antecedent jurisprudence of third party liability." 3 Nimmer, *supra,* § 12.04[A][3][a], at 12–84 n. 81.

Although the *Peter Starr* court recognized that the addition of the authorization right in the 1976 Act "was intended to remove the confusion surrounding contributory ... infringement," *Peter Starr,* 783 F.2d at 1443, it did not consider the applicability of an essential attribute of the doctrine identified above: that contributory infringement, even when triggered solely by an "authorization," is a form of third party liability that requires the authorized acts to constitute infringing ones.

We believe that the *Peter Starr* court erred in not applying this principle to the authorization of acts that cannot themselves be infringing because they take place entirely abroad. As Professor Nimmer has observed:

> Accepting the proposition that a direct infringement is a prerequisite to third party liability, the further question arises whether the direct infringement on which liability is premised must take place within the United States. Given the undisputed axiom that United States copyright law has no extraterritorial application, it would seem to follow necessarily that a primary activity outside the boundaries of the United States, not constituting an infringement cognizable under the Copyright Act, cannot serve as the basis for holding liable under the Copyright Act one who is merely related to that activity within the United States.

3 Nimmer, *supra,* § 12.04[A][3][b], at 12–86 (footnotes omitted).

Appellees resist the force of this logic, and argue that liability in this case is appropriate because, unlike in *Lewis Galoob* and *Columbia Pictures,* in which the alleged primary infringement consisted of acts that were entirely outside the purview of 17 U.S.C. § 106(1)–(5) (and presumably lawful), the conduct authorized in this case was precisely that prohibited by section 106, and is only uncognizable because it occurred outside the United States. Moreover, they contend that the conduct authorized in this case would have been prohibited under the copyright laws of virtually every nation. *See also* 1 Goldstein, *supra,* § 6.1, at 706 n. 4 (suggesting that "*Peter Starr*'s interpretation of section 106's authorization right would appear to be at least literally correct since the statute nowhere requires that the direct infringement occur within the United States."); *ITSI T.V. Prods., Inc. v. California Auth. of Racing Fairs,* 785 F.Supp. 854, 863 (E.D.Cal. 1992) (asserting that "because 'authorization' is itself actionable as a 'direct' act of copyright infringement, the fact that the act 'authorized' occurs abroad is irrelevant"), *rev'd on other grounds,* 3 F.3d 1289 (9th Cir.1993).

Even assuming *arguendo* that the acts authorized in this case would have been illegal abroad, we do not believe the distinction offered by Appellees is a relevant one. Because the copyright laws do not apply extraterritorially, each of the rights conferred under the five section 106 categories must be read as extending "no farther than the [United States'] borders." 2 Goldstein, *supra*, § 16.0, at 675. *See, e.g., Robert Stigwood*, 530 F.2d at 1101 (holding that no damages could be obtained under the Copyright Act for public performances in Canada when preliminary steps were taken within the United States and stating that "[t]he Canadian performances, while they may have been torts in Canada, were not torts here"); *see also Filmvideo Releasing Corp. v. Hastings*, 668 F.2d 91, 93 (2d Cir.1981) (reversing an order of the district court that required the defendant to surrender prints of a film because the prints could be used to further conduct abroad that was not proscribed by United States copyright laws). In light of our above conclusion that the "authorization" right refers to the doctrine of contributory infringement, which requires that the authorized act *itself* could violate one of the exclusive rights listed in section 106(1)–(5), we believe that "[i]t is simply not possible to draw a principled distinction" between an act that does not violate a copyright because *it is not the* type of conduct proscribed by section 106, and one that does not violate section 106 because the illicit act occurs overseas. *Danjaq, S.A. v. MGM/UA Communications, Co.*, 773 F.Supp. 194, 203 (C.D.Cal.1991), *aff'd on other grounds*, 979 F.2d 772 (9th Cir.1992). In both cases, the authorized conduct could not violate the exclusive rights guaranteed by section 106. In both cases, therefore, there can be no liability for "authorizing" such conduct. *See also* 3 Nimmer, *supra*, § 12.-04[A][3][b], at 12–87 to 12–88.

To hold otherwise would produce the untenable anomaly, inconsistent with the general principles of third party liability, that a party could be held liable as an infringer for violating the "authorization" right when the party that it authorized could not be considered an infringer under the Copyright Act. Put otherwise, we do not think Congress intended to hold a party liable for *merely* "authorizing" conduct that, had the *authorizing* party chosen to engage in itself, would have resulted in no liability under the Act. *Cf. Robert Stigwood*, 530 F.2d at 1101.[8]

Appellees rely heavily on the Second Circuit's doctrine that extraterritorial application of the copyright laws is permissible "when the type of infringement permits further reproduction abroad." *Update Art, Inc. v. Modiin Publishing, Ltd.*, 843 F.2d 67, 73 (2d Cir.1988). Whatever the merits of the Second Circuit's rule, and we express no opinion on its validity in this circuit, it is premised on the theory that the copyright holder may recover damages that stem from a direct infringement of its exclusive rights that occurs *within* the United States. *See Robert Stigwood*, 530 F.2d at 1101; *Sheldon v. Metro–Goldwyn Pictures Corp.*, 106 F.2d 45, 52 (2d Cir.1939) (L. Hand, J.) ("The negatives were 'records' from which the work could be 'reproduced', and it was a tort to make them in this country. The plaintiffs acquired an equitable interest in them as soon as they were made, which attached to any profits from their exploitation...."), *aff'd*, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940); *see also Ahbez v. Edwin H. Morris & Co., Inc.*, 548 F.Supp. 664, 667 (S.D.N.Y. 1982); *Famous Music Corp. v. Seeco Records, Inc.*, 201 F.Supp. 560, 568–69 (S.D.N.Y. 1961).[9] In these cases, liability is not based on contributory infringement, but on the theory that the infringing use would have been actionable *even if* the subsequent foreign distribution that stemmed from that use never took place. *See, e.g., Famous Music*, 201 F.Supp. at 569 ("[T]hat a copyright has no

---

8. We express no opinion on whether liability might attach when a party authorizes an act that *could* constitute copyright infringement, but the "attempted" infringement fails.

9. Professor Nimmer formulates the doctrine in the following terms:

[I]f and to the extent a part of an 'act' of infringement occurs within the United States, then, although such act is completed in a foreign jurisdiction, those parties who contributed to the act within the United States may be rendered liable under American copyright law.
3 Nimmer, *supra*, § 17.02, at 17–19 (footnotes omitted).

extra-territorial effect[ ] does not solve th[e] problem of [whether liability should attach for preparing within the United States tapes that were part of a] manufacture [completed abroad] since plaintiffs seek to hold defendant for what it did *here* rather than what it did abroad." (emphasis in original)). These cases, therefore, simply are inapplicable to a theory of liability based merely on the authorization of noninfringing acts.

Accordingly, accepting that wholly extraterritorial acts of infringement cannot support a claim under the Copyright Act, we believe that the *Peter Starr* court, and thus the panel in this case, erred in concluding that the mere authorization of such acts supports a claim for infringement under the Act.

## II. The Extraterritoriality of the Copyright Act

■ Appellees additionally contend that, if liability for "authorizing" acts of infringement depends on finding that the authorized acts themselves are cognizable under the Copyright Act, this court should find that the United States copyright laws *do extend* to extraterritorial acts of infringement when such acts "result in adverse effects within the United States." Appellees buttress this argument with the contention that failure to apply the copyright laws extraterritorially in this case will have a disastrous effect on the American film industry, and that other remedies, such as suits in foreign jurisdictions or the application of foreign copyright laws by American courts, are not realistic alternatives.

We are not persuaded by Appellees' parade of horribles.[10] More fundamentally, however, we are unwilling to overturn over eighty years of consistent jurisprudence on the extraterritorial reach of the copyright laws without further guidance from Congress.

The Supreme Court recently reminded us that "[i]t is a long-standing principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *EEOC v. Arabian American Oil Co.* (*Aramco*), 499 U.S. 244, 248, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949)). Because courts must "assume that Congress legislates against the backdrop of the presumption against extraterritoriality," unless "there is 'the affirmative intention of the Congress clearly expressed'" congressional enactments must be presumed to be "'primarily concerned with domestic conditions.'" *Id.* 499 U.S. at 248, 111 S.Ct. at 1230 (quoting *Foley Bros.*, 336 U.S. at 285, 69 S.Ct. at 577 and *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957)).

The "undisputed axiom," 3 Nimmer, *supra*, § 12.04[A][3][b], at 12–86, that the United States' copyright laws have no application to extraterritorial infringement predates the 1909 Act, *see, e.g., United Dictionary Co. v. G. & C. Merriam Co.*, 208 U.S. 260, 264–66, 28 S.Ct. 290, 290–91, 52 L.Ed. 478 (1908)

**10.** As Appellants note, breach of contract remedies (such as those pursued in this case) remain available. Moreover, at least one court has recognized that actions under the copyright laws of other nations may be brought in United States courts. *See London Film Prods. Ltd. v. Intercontinental Communications, Inc.*, 580 F.Supp. 47, 48–50 (S.D.N.Y.1984). *See generally* 2 Goldstein, *supra*, § 16.3, at 683 ("Subject to jurisdictional requirements, a copyright owner may sue an infringer in United States courts even though the only alleged infringement occurred in another country."). *But see ITSI*, 785 F.Supp. at 866 (discerning, despite *London Film*, "no clear authority for exercising such jurisdiction" (citing David R. Toraya, Note, *Federal Jurisdiction Over Foreign Copyright Actions—An Unsolicited Reply to Professor Nimmer*, 70 Cornell L.Rev. 1165 (1985)), and stating that "American courts

should be reluctant to enter the bramble bush of ascertaining and applying foreign law without an urgent reason to do so"). Finally, although we note that the difficulty of protecting American films abroad is a significant international trade problem, *see generally* Jan D'Alessandro, Note, *A Trade Based Response to Intellectual Property Piracy: A Comprehensive Plan to Aid the Motion Picture Industry*, 76 Geo. L.J. 417 (1987), the United States Congress, in acceding to the Berne Convention, has expressed the view that it is through increasing the protection afforded by *foreign* copyright laws that domestic industries that depend on copyright can best secure adequate protection. *See* H.R.Rep. No. 609, 100th Cong., 2d Sess. 18–20; S.Rep. 352, 100th Cong., 2d Sess. 2–5, *reprinted in* 1988 U.S.C.C.A.N., 3706, 3707–10.

(Holmes, J.), and, as discussed above, the principle of territoriality consistently has been reaffirmed, *see, e.g., Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657, 662 (2d Cir.1955) (citing *American Code Co. v. Bensinger*, 282 F. 829, 833 (2d Cir.1922) ("The copyright laws of one country have no extraterritorial operation, unless otherwise provided." (citing *Ferris v. Frohman*, 223 U.S. 424, 32 S.Ct. 263, 56 L.Ed. 492 (1912)))); *sources cited supra* pp. 1093–94. There is no clear expression of congressional intent in either the 1976 Act or other relevant enactments to alter the preexisting extraterritoriality doctrine. Indeed, the *Peter Starr* court itself recognized the continuing application of the principle that "infringing actions that take place entirely outside the United States are not actionable in United States federal courts." *Peter Starr*, 783 F.2d at 1442 (citing *Robert Stigwood*, 530 F.2d at 1101).

Furthermore, we note that Congress chose in 1976 to expand one specific "extraterritorial" application of the Act by declaring that the unauthorized importation of copyrighted works constitutes infringement even when the copies lawfully were made abroad. *See* 17 U.S.C.A. § 602(a) (West Supp.1992).[11] Had Congress been inclined to overturn the preexisting doctrine that infringing acts that take place wholly outside the United States are not actionable under the Copyright Act, it knew how to do so. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 440, 109 S.Ct. 683, 691, 102 L.Ed.2d 818 (1989) ("When it desires to do so, Con-

gress knows how to place the high seas within the jurisdictional reach of a statute." (quoted in *Aramco*, 499 U.S. at 258, 111 S.Ct. at 1235)). Accordingly, the presumption against extraterritoriality, "far from being overcome here, is doubly fortified by the language of [the] statute," *Smith v. United States*, —— U.S. ——, ——, 113 S.Ct. 1178, 1183, 122 L.Ed.2d 548 (1993) (quoting *United States v. Spelar*, 338 U.S. 217, 222, 70 S.Ct. 10, 13, 94 L.Ed. 3 (1949)), as set against its consistent historical interpretation.

Appellees, however, rely on dicta in a recent decision of the District of Columbia Circuit for the proposition that the presumption against extraterritorial application of U.S. laws may be "overcome" when denying such application would "result in adverse effects within the United States." *Environmental Defense Fund, Inc. v. Massey*, 986 F.2d 528, 531 (D.C.Cir.1993) (noting that the Sherman Act, Lanham Act, and securities laws have been applied to extraterritorial conduct).[12] However, the *Massey* court did not state that extraterritoriality would be *demanded* in such circumstances, but that "the *presumption* is *generally* not *applied* where the failure to extend the scope of the statute to a foreign setting will result in adverse [domestic] effects." *Id.* at 531 (emphasis added). In each of the statutory schemes discussed by the *Massey* court, the ultimate touchstone of extraterritoriality consisted of an ascertainment of congressional intent; courts did not rest *solely* on the consequences of a failure to give a statutory scheme extraterritorial application.[13] More

---

**11.** The 1909 Act contained a similar provision that prohibited "the importation into the United States ... of any *piratical* copies of any work copyrighted in the United States." Act of Mar. 4, 1909, ch. 320, § 30, 35 Stat. 1075, 1082 (1909) (emphasis added). *See generally Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc.*, 832 F.Supp. 1378, 1389–91 (C.D.Cal.1993) (noting that the perceived inadequacies of other remedies provided the impetus for extending the import prohibition to copies lawfully made abroad).

**12.** The court ultimately concluded that the case did "not present an issue of extraterritoriality" because virtually all of the relevant conduct (relating to the application of the National Environmental Policy Act to Antarctica) occurred within the United States. *Massey*, 986 F.2d at 532–33.

**13.** *See Aramco*, 499 U.S. at 252, 111 S.Ct. at 1232 (explaining the source of the extraterritorial application of the Lanham Act as its "'broad jurisdictional grant'" that had a "'sweeping reach into all commerce which may lawfully be regulated by Congress'" (quoting *Steele v. Bulova Watch Co.*, 344 U.S. 280, 285, 287, 73 S.Ct. 252, 255, 256, 97 L.Ed. 319 (1952) (internal quotations omitted)); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 443 (2d Cir.1945) (L. Hand, J.) (antitrust laws) ("[W]e are concerned only with whether Congress chose to attach liability to conduct outside the United States of persons not in allegiance to it."); *Schoenbaum v. Firstbrook*, 405 F.2d 200, 206 (2d Cir.1968) (securities laws) ("We believe that Congress intended the Exchange Act to have extraterritorial application in order to protect domestic investors...."), *partially rev'd on other grounds*, 405

importantly, as the *Massey* court conceded, *see id.* at 532–33, application of the presumption is particularly appropriate when "[i]t serves to protect against unintended clashes between our laws and those of other nations which could result in international discord," *Aramco,* 499 U.S. at 248, 111 S.Ct. at 1230 (citing *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 20–22, 83 S.Ct. 671, 677–78, 9 L.Ed.2d 547 (1963)).[14]

We believe this latter factor is decisive in the case of the Copyright Act, and fully justifies application of the *Aramco* presumption even assuming *arguendo* that "adverse effects" within the United States "generally" would require a plenary inquiry into congressional intent. At the time that the international distribution of the videocassettes in this case took place, the United States was a member of the Universal Copyright Convention ("UCC"), and, in 1988, the United States acceded to the Berne Convention for the Protection of Literary and Artistic Works ("Berne Conv."). The central thrust of these multilateral treaties is the principle of "national treatment." A work of an American national first generated in America will receive the same protection in a foreign nation as that country accords to the works of its own nationals. *See* UCC Art. II; Berne Conv. Art. V. *See generally* 1 International Copyright Law and Practice, Intr. § 5, at 145–74 (Paul E. Geller & Melville B. Nimmer eds., 1993) [hereinafter Geller & Nimmer]; Stephen M. Stewart, International Copyright and Neighboring Rights 37–48 (2d ed. 1989). Although the treaties do not expressly discuss choice-of-law rules, *see* Geller & Nimmer, *supra,* Intr. § 6, at 181–83, 189,[15] it is commonly acknowledged that the national treatment principle implicates a rule of terri-

toriality. *See London Film Prods. Ltd. v. Intercontinental Communications, Inc.,* 580 F.Supp. 47, 50 n. 6 (S.D.N.Y.1984); *see also* 3 Nimmer, *supra,* § 17.05, at 17–39 ("The applicable law is the copyright law of the state in which the infringement occurred, not that of the state of which the author is a national or in which the work was first published."). *See generally* Geller & Nimmer, *supra,* Intr. § 6, at 182; Stewart, *supra,* at 46–47. Indeed, a recognition of this principle appears implicit in Congress's statements in acceding to Berne that "[t]he primary mechanism for discouraging discriminatory treatment of foreign copyright claimants is the principle of national treatment," H.R.Rep. No. 609, 100th Cong., 2d Sess. 43 [hereinafter House Report], and that adherence to Berne will require "careful due regard for the[ ] values" of other member nations, *id.* at 20.

In light of the *Aramco* Court's concern with preventing international discord, we think it inappropriate for the courts to act in a manner that might disrupt Congress's efforts to secure a more stable international intellectual property regime unless Congress otherwise clearly has expressed its intent. The application of American copyright law to acts of infringement that occur entirely overseas clearly could have this effect. Extraterritorial application of American law would be contrary to the spirit of the Berne Convention, and might offend other member nations by effectively displacing their law in circumstances in which previously it was assumed to govern. Consequently, an extension of extraterritoriality might undermine Congress's objective of achieving " 'effective and harmonious' copyright laws among all nations." House Report, *supra,* at 20. Indeed, it might well send the signal that the United

F.2d 215 (2d Cir.1968) (en banc), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

14. Of course, this is not the sole source of the presumption. *See Smith,* —— U.S. at —— n. 5, 113 S.Ct. at 1183 n. 5 (noting that the presumption "is rooted in a number of considerations, not the least of which is the common-sense notion that Congress generally legislates with domestic concerns in mind"). However, preventing international discord clearly is one of the most important values that it furthers. *See, e.g., Benz,* 353 U.S. at 147, 77 S.Ct. at 704.

15. The Berne Convention specifies that domestic law governs a work's protection in its country of origin. *See* Berne Conv. Art. V(3). For acts of infringement that occur in other nations, however, the treaty uses the ambiguous concept of the "law of the country where protection is claimed." *Id.* Art. V(2). *See generally* Eugen Ulmer, Intellectual Property Rights and the Conflict of Laws 11–12 (1978); World Intellectual Property Organization, Guide to the Berne Convention 32–34 (1978).

States does not believe that the protection accorded by the laws of other member nations is adequate, which would undermine two other objectives of Congress in joining the convention: "strengthen[ing] the credibility of the U.S. position in trade negotiations with countries where piracy is not uncommon" and "rais[ing] the like[li]hood that other nations will enter the Convention." S.Rep. 352, 100th Cong., 2d Sess. 4–5, *reprinted in* 1988 U.S.C.C.A.N., 3706, 3709–10.[16]

Moreover, although Appellees contend otherwise, we note that their theory might permit the application of American law to the distribution of protected materials in a foreign country conducted exclusively by citizens of that nation. A similar possibility was deemed sufficient in *Aramco* to find a provision that, on its face, appeared to contemplate that Title VII would be applied overseas, insufficient to rebut the presumption against extraterritoriality. *See Aramco*, 499 U.S. at 254, 111 S.Ct. at 1234. Of course, under the Berne Convention, all states must guarantee minimum rights, *see* Berne Conv. Art. IV; Stewart, *supra*, at 39–40, and it is plausible that the application of American law would yield outcomes roughly equivalent to those called for by the application of foreign law in a number of instances. Nonetheless, extending the reach of American copyright law likely would produce difficult choice-of-law problems, *cf.* House Report, *supra*, at 43 ("[Berne] does not, however, require all countries to have identical legal systems and procedural norms."), dilemmas that the federal courts' general adherence to the territoriality principle largely has obviated. *See* 3 Nimmer, *supra*, § 17.05, at 17–39 (noting that the "national treatment" principle has resulted in the absence of "[c]onflicts of law problems . . . in the law of copyright");

*see also* 2 Goldstein, *supra*, § 16.2, at 681–82, § 16.3, at 683. Even if courts, as a matter of comity, would assert extraterritorial jurisdiction only when the effects in the United States and the contacts of the offending party with this country are particularly strong, *cf. Timberlane Lumber Co. v. Bank of Am., N.T. & S.A.*, 549 F.2d 597, 615 (9th Cir.1976), *cert. denied*, 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985), that the assertion of such jurisdiction would engender new and troublesome choice-of-law questions provides a compelling reason for applying the *Aramco* presumption. *Cf. Massey*, 986 F.2d at 533 (noting that the *absence* of " 'choice of law' dilemmas" in applying the National Environmental Policy Act to projects in Antarctica provided a reason for *not* applying the presumption).

Accordingly, because an extension of the extraterritorial reach of the Copyright Act by the courts would in all likelihood disrupt the international regime for protecting intellectual property that Congress so recently described as essential to furthering the goal of protecting the works of American authors abroad, *see supra* note 10, we conclude that the *Aramco* presumption must be applied. *Cf. Benz*, 353 U.S. at 147, 77 S.Ct. at 704 ("For us to run interference in such a delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed."). Because the presumption has not been overcome, we reaffirm that the United States copyright laws do not reach acts of infringement that take place entirely abroad. It is for Congress, and not the courts, to take the initiative in this field.

### III. Other Arguments

Appellees. raise a number of additional arguments for why the district court's judg-

---

**16.** Indeed, the concern that action by the courts could interfere with Congress's efforts to secure a multilateral regime of intellectual property protection has been heightened by the use of the Berne Convention as the model for the "TRIPS" agreement on intellectual property protection that emerged as part of the recently completed GATT negotiations. *See Capitol Hill Hearing Testimony*, Fed. Doc. Clearing House Cong. Testimony (CCH), at *1–*2 (Mar. 8, 1994) (testimony of Jacques J. Gorlin, consulting economist to the Intellectual Property Committee, before the House Subcommittee on Economic Policy, Trade and Environment of the Committee on Foreign Affairs) (noting that TRIPS largely requires participating members to "comply with the Berne Convention"), *available in* LEXIS, News library, Curnws file. One of Congress's stated objectives in adhering to Berne was to provide a firm foundation for the enactment of a more comprehensive agreement on intellectual property protection through GATT. *See* House Report, *supra*, at 21; S.Rep. 352, 100th Cong., 2d Sess. 6, *reprinted in* 1988 U.S.C.C.A.N. 3706, 3711.

ment should be affirmed. Relying upon the Second Circuit's doctrine described above, *see supra* p. 1094, Appellees maintain that they may recover damages for international distribution of the Picture based on the theory that an act of direct infringement, in the form of a reproduction of the negatives for the Picture, took place in the United States. Appellees also suggest that they may recover, under United States law, damages stemming from the international distribution on the theory that the distribution was part of a larger conspiracy to violate their copyright that included actionable infringement within the United States. In addition, they maintain that Appellants are liable for the international distribution under foreign copyright laws. Finally, Appellees argue that the district court's damage award can be sustained under the breach of contract theory not reached by the panel.

We resolve none of these questions, but leave them for the panel, in its best judgment, to consider. A remand to the district court might well be necessary to permit further factual development in light of our decision to overrule aspects of *Peter Starr.* The panel, however, is free to take whatever action it views as appropriate that is consistent with our mandate. *See Haphey v. Linn County,* 953 F.2d 549, 552 (9th Cir.1992) (en banc).

### Conclusion

We hold that the mere authorization of acts of infringement that are not cognizable under the United States copyright laws because they occur entirely outside of the United States does not state a claim for infringement under the Copyright Act. *Peter Starr* is overruled insofar as it held to the contrary. Accordingly, we vacate Part III of the panel's disposition, in which it concluded that the international distribution of the film constituted a violation of the United States copyright laws. We also vacate that portion of the disposition that affirmed the damage award based on foreign distribution of the film and the panel's affirmance of the award of attorneys' fees. Finally, we vacate the district court's grant of injunctive relief insofar as it was based on the premise that the

Distributors had violated the United States copyright laws through authorization of the foreign distribution of the Picture on videocassettes. *Cf. Filmvideo,* 668 F.2d at 93–94.

The cause is remanded to the panel for further proceedings consistent with the mandate of this court.

**Vacated in Part** and **Remanded.**